No. 14,254.

People ex rel. Rogers, Attorney General *v.* Letford
ET AL.
(79 P. [2d] 274)

Decided May 2, 1938.

Mr. BYRON G. ROGERS, Attorney General, Mr. C. E. SYD-
NER, Mr. HENRY E. LUTZ, Assistants, Mr. DAVID J. MILLER,
of counsel, for relator.

Mr. THOMAS A. NIXON, Mr. WILLIAM R. KELLY, for re-
spondents.

*En Banc.*

MR. JUSTICE KNOUS delivered the opinion of the court.

THIS is an original proceeding in quo warranto
upon information of the Attorney General to try the right
of respondents to occupy the office and exercise the duties
of directors of Northern Colorado Water Conservancy
District, organized under the provisions of the Water
Conservancy Act of Colorado, chapter 266, S. L. 1937, by
the findings and decree of the district court of the Eighth
Judicial District sitting in and for Weld county. This
action is permissible under section 3, article VI of the
Constitution, is of the nature of a common law proceeding
searching the entire record, and is not limited by sections
321 to 330 of the Code of Civil Procedure. *People ex rel.
Williams v. Reid,* 11 Colo. 138, 17 Pac. 302. The Water
Conservancy Act, by its terms, section 7, invites such a
proceeding and fixes the time within which the action may
be brought, which provision was here complied with. The

plea and answer of the respondents is a justification of the right to exercise and hold their office as directors of the conservancy district, and the cause is at issue on relator's demurrer thereto. In effect, the solution of this issue requires a judicial determination of the validity and constitutionality of the Water Conservancy Act.

At the outset it may well be said in this proceeding, as was stated in the case of *Lehi City v. Meiling*, 87 Utah 237, 244, 48 P. (2d) 530, wherein the Supreme Court of Utah considered the constitutionality of the Metropolitan Water District Act of Utah, Laws of Utah 1935, chapter 110, that "On this hearing we are concerned merely with such questions as arise upon the threshold of the formation of the proposed district * * * and with those considerations which involve the constitutionality of the act itself as distinguished from the validity of particular portions thereof, or the exercise of particular powers by the district or its officers after incorporation and in the course of operation."

The relator asserts that the act contravenes a number of provisions of both the state and federal Constitutions. The briefs in support of the respective contentions of the parties are unusually thorough and exhaustive and, with the oral arguments of counsel, have proven of invaluable assistance to the court in considering the numerous points involved.

In approaching the question of the validity and constitutionality of the statute, it is well to keep in mind certain fundamental rules. When an act of the legislature is attacked on the ground of unconstitutionality, the question presented is not whether it may be voided but whether it is possible to uphold it. *Denver v. Knowles*, 17 Colo. 204, 30 Pac. 1041. Every presumption will be indulged in favor of the legislation and only clear and demonstrable usurpation of power will authorize judicial interference with legislative action. *Green v. Frazier*, 253 U. S. 233, 64 L. Ed. 878, 40 Sup. Ct. 499. The rule was well stated by the Supreme Court of Massachusetts in *Wellington*

*et al. Petitioners,* 16 Pick. 87, and quoted with approval by us in *Milheim v. Moffat Tunnel District,* 72 Colo. 268, 273 (211 Pac. 649), as follows: "When called upon to pronounce the invalidity of an act of legislation passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt."

 The Colorado act was passed by the 31st General Assembly and became effective on May 13, 1937. It was intended to make possible the organization of what is designated as "Water Conservancy Districts." Section 1 of the Act (C. S. A. '37 Supp., c. 173A, §15), states the purpose of the legislature in passing the law in the following words:

"It is hereby declared that to provide for the conservation of the water resources of the state of Colorado and for the greatest beneficial use of water within this state, the organization of water conservancy districts and the construction of works as herein defined by such districts are a public use and will:

"(a) Be essentially for the public benefit and advantage of the people of the state of Colorado.

"(b) Indirectly benefit all industries of the state.

"(c) Indirectly benefit the state of Colorado in the increase of its taxable property valuation:

"(d) Directly benefit municipalities by providing adequate supplies of water for domestic use.

"(e) Directly benefit lands to be irrigated from works to be constructed.

"(f) Directly benefit lands now under irrigation by stabilizing the flow of water in streams and by increasing flow and return flow of water to such streams.

"(g) Promote the comfort, safety and welfare of the

people of the state of Colorado, and it is therefore declared to be the policy of the state of Colorado:

"(1) To control, make use of and apply to beneficial use all unappropriated waters originating in this state to a direct and supplemental use of such waters for domestic, manufacturing, irrigation, power and other beneficial uses.

"(2) To obtain from water originating in Colorado the highest duty for domestic uses and irrigation of lands in Colorado within the terms of interstate compacts.

"(3) To co-operate with the United States under the federal reclamation laws now or hereinafter enacted and other agencies of the United States government for the construction and financing of works in the state of Colorado as herein defined and for the operation and maintenance thereof.

"(4) To promote the greater prosperity and general welfare of the people of the state of Colorado by encouraging the organization of water conservancy districts as provided in this article."

The act is general in its nature and upon compliance with its terms a water conservancy district can be formed at any place within the state of Colorado. It is not amendatory of any existing statute and its provisions are not directly dependent upon other Colorado laws. As is evident from a consideration of the titles of its nine subdivisions, it was designed to cover the entire subject involved in all its angles. These subdivisions and titles are as follows:

Subdivision 1. "Short title—Declaration and Interpretation."

Subdivision 2. "Organization of Water Conservancy Districts."

Subdivision 3. "Board of Directors—Powers and Duties."

Subdivision 4. "Financial Administration—Taxes—Assessments."

Subdivision 5. "Water Administration."

Subdivision 6. "Inclusion and Exclusion of Lands."
Subdivision 7. "Contracts—Bonded Indebtedness."
Subdivision 8. "Proceedings—Confirmation."
Subdivision 9. "Construction — Interpretation — Repeal."

With the exception of sections 1, 15 to 19 inclusive and 25 to 28 inclusive, all of the provisions of the act, either in the precise words, in a modified form required by the circumstances, or at least in substance, have been taken from the Conservancy Act of Colorado, S. L. 1922, Extraordinary Session, chapter 1, page 11, '35 C. S. A., chapter 138, sections 126 to 199 inclusive; the Moffat Tunnel Improvement District Act, S. L. 1922, Extraordinary Session, chapter 2, page 88, '35 C. S. A., chapter 138, article III, sections 200 to 220; the Internal Improvement District Act, S. L. 1923, chapter 156, sections 43 to 47 inclusive; the Colorado Irrigation District Act of 1905, as amended, '35 C. S. A., chapter 90, sections 419 to 423 inclusive; and the Metropolitan Water Districts Act of Utah, Laws of Utah, 1935, chapter 110, which in turn was taken from the Metropolitan Water District Act of California, Statutes of 1927, page 695, amended statutes of 1929, page 1613. By analogy are embraced certain principles contained in the Bridge and Highway District Act of California.

Although the great bulk of the Colorado act was lifted from the various laws indicated, all of which have been declared constitutional by the courts of last resort in these various states, the character of the districts contemplated by our law differs in some essential respects, both as to the basis of their formation and the powers of their officials, from those authorized under the acts enumerated.

Pursuant to this act and admittedly in strict accordance with its procedural provisions, the district court of Weld county, on September 20, 1937, entered its findings and decree organizing the Northern Colorado Water Conservancy District, which includes generally the lands in the agricultural areas in the vicinity of the St. Vrain, Big Thompson, Cache la Poudre rivers and of the Platte river

from Platteville to the eastern line of Colorado. The approximate present total valuation of these farm lands and improvements thereon within the district is alleged to be $40,000,000, in addition to which it is said there has been an economic development within the district of approximately $100,000,000, making a total assessed valuation of all property within the district, both real and personal, of approximately $140,000,000. This economic development has resulted from the building of the cities of Greeley, Eaton, Boulder, Fort Collins, Longmont, Loveland, Fort Morgan, Brush, Sterling and Julesburg and numerous other towns and hamlets of various size. In this economic development is also embraced a number of sugar factories, extensive public carrier and utility developments and other large and prosperous businesses, all of which is due principally to the agricultural development which has been made in the district by application of water for the irrigation of the lands therein. The projected further development of this section by the construction of what is commonly known as the "Colorado-Big Thompson Project" allegedly is the motivating cause for the formation of the Northern Colorado Water Conservancy District. The Colorado-Big Thompson Project contemplates the construction of a number of large reservoirs on the western slope of the Continental Divide on the Colorado river and its tributaries, and the diversion of the waters of that river through the Continental Divide by means of canals and tunnels to the Big Thompson river on the eastern slope of the Continental Divide, from whence, through a series of reservoirs, canals and other facilities, the water ultimately is destined for delivery to the municipalities and lands in the district. As an integral part of the project, the construction of a reservoir on the Blue river on the western slope for the purpose of replacement of water diverted to the eastern slope and to compensate and stabilize the flow of the Colorado river is included. After a detailed survey made under its auspices, with funds provided by the United States, the

Bureau of Reclamation has approved the feasibility of the project.

Preliminary to the consideration of the various constitutional questions involved and as decisive of many of these points, it is necessary to determine the legal nature and character of the corporation intended to be created under the Water Conservancy Act. The act itself, in section 7, declares that: "* * * the district shall be a political subdivision of the state of Colorado and a body corporate with all the powers of a public or municipal corporation." While a legislative declaration of this nature is not conclusive upon a court, it must be seriously regarded in the construction of an act. In this connection also must be considered the purpose of the law, not only as disclosed by its words, but also in the light of the physical conditions of the state, its needs and the character and extent of the projected benefits. *Milheim v. Moffat Tunnel District, supra.*

It is a matter of common knowledge that due to climatic conditions, except in a few limited areas, agricultural crops cannot be produced in Colorado except by irrigation of the land. Also it was early evident, and still is obvious, that the economic and industrial development of an arid state is directly dependent on its water supply. In the early development of the state, through the industry of the pioneers and by means of comparatively inexpensive works, the waters of our natural streams were utilized in irrigation in the immediate vicinity of the source of the water supply. Later, when the possibilities of this method of development had become exhausted, more ambitious irrigation programs were devised. This era was marked by the formation of irrigation districts and the expansion of mutual and private ditch and reservoir companies by means of projects financed by private capital. By these processes, aided by the extreme fertility of our soils and other favorable conditions, the agricultural industry has become one of the most important in our state. Notwithstanding these accomplishments, for many years it has

been apparent in Colorado, as well as other states in the arid regions of the West, that neither the resources of the farmers nor the facilities of private capital were able to finance the major irrigation projects commonly involving great dams, tunnels and extensive diversion works required to meet the increasing demands of the population and of the agricultural market in providing water from distant sources for the thousands upon thousands of acres of virgin lands within this area. In recognition of this situation, the federal government inaugurated the Bureau of Reclamation and the Congress of the United States appropriated large sums of money for federal reclamation projects which now are scattered through the West. By the circumstance that Colorado is traversed by the Rocky Mountains, forming the Continental Divide between the Atlantic and Pacific oceans, and upon the crest of which the snow falls abundantly in the winter months and where the summer rainfall is heavier than in the adjacent arid plains regions, several of the largest and most important streams in the Southwest have their beginning within our state. As time passed the people in our neighboring states have appropriated and put to a beneficial use a large amount of the waters of these streams and this subject has been a cause of vexatious litigation between them and Colorado. Recently, upon several of these interstate streams, and beyond the boundaries of Colorado, large and expensive works have been completed or are in the course of construction, which have for their purpose the diversion and beneficial use in other states of waters originating in this state and by virtue of which vested rights will accrue to the inhabitants of these states, to the impairment of Colorado's development. It also is well known that in many parts of Colorado the waters of our streams have been overappropriated, to the great distress of the inhabitants of those regions and the economic detriment of the state generally. It is reasonably asserted by competent engineering authority that by the construction of adequate water storage and diversion systems, water

may be carried from regions within our state having a surplus to those suffering from the lack of a sufficient supply and by this process our statewide water supply made to do full duty before flowing from our borders. Such a program of conservancy is eminently a matter of state-wide concern.

These circumstances demonstrate, and we conclude, as the language of the act states, that its objects are of sufficient public benefit and advantage to the people of Colorado as a whole to constitute a public purpose and that the water conservancy districts authorized thereby are state agencies and public corporations. Of public corporations, it is said in 43 C. J., page 72: "Public corporations are all those created specially for public purposes as instruments or agencies to increase the efficiency of government, supply public wants, and promote the public welfare. Public corporations are classified as municipal, quasi-municipal, and public-quasi corporations. Public corporations include not only municipal corporations, but also all other incorporated agencies of government of whatever size and form or degree of organization. While all municipal corporations are public corporations, all public corporations are not municipal corporations."

Our legislature did not confer the ordinary functions of local governments enjoyed by towns and cities on the Water Conservancy Districts contemplated, but did vest in them powers which have come to be associated with true municipal corporations, including the power of taxation to further its purpose.

In Utah, California and other states, public agencies generally analogous in character to the water conservancy districts under consideration have been judicially designated "quasi-municipal" corporations. *Lehi City v. Meiling, supra; Henshaw v. Foster*, 176 Cal. 507, 169 Pac. 82; *Wheatley v. Superior Court*, 207 Cal. 722, 279 Pac. 989; *Golden Gate Bridge & Highway Dist. v. Felt*, 214 Cal. 308, 5 P. (2d) 585.

The basis for this conclusion is well exemplified by the following excerpt from the majority opinion of the Supreme Court of Utah in the case of *Lehi City v. Meiling, supra,* at page 261:

"A Metropolitan Water District is not a 'municipal corporation' within contemplation of the Constitution, but it is a public agency or entity created for beneficial and necessary public purposes. Its corporate structure is substantially the same as that of the Metropolitan Water District of California, and other agencies of that state which have been held valid as public and quasi-municipal corporations or districts. *Wheatley v. Superior Court in and for Napa County,* 207 Cal. 722, 279 P. 989.

"The characterization 'quasi-municipal' we think accurate. The water district is not a true municipal corporation having powers of local government, but is an agency of the state vested with some of the powers and attributes of a municipality; hence it is not a municipal corporation but is quasi-municipal. 'Quasi' is defined as follows in 51 C. J. 119: 'A Latin word, in frequent use in the civil law, signifying "as if, almost." ' It marks the resemblance, and supposes a little difference, between two objects."

The Utah Constitution, article XIV, section 4, provides that cities, towns or *other municipal corporations* shall not become indebted to an amount exceeding four per cent of the value of the taxable property therein, which limitation was invoked as to the water district involved, so a greater refinement in appellation was required of the Utah court than is the case with us since under section 8, article XI, of our Constitution the debt limitations apply only to towns and cities, and "other municipal corporations" are not mentioned. In view of this, and of other constitutional provisions of like character which we shall later mention, it likely is not vital in Colorado whether the district, definitely not a city or town, be declared a municipal corporation in the sense used by this court in

*Milheim v. Moffat Tunnel District, supra,* or a quasi-municipal corporation. However this may be, we believe the designation ''quasi-municipal corporation'' technically and aptly characterizes the water conservancy districts sanctioned by our Water Conservancy Act and so such districts will be designated as quasi-municipal corporations, designed for state purposes as distinguished from private or local municipal purposes in the proprietary sense. The circumstance that the Metropolitan Water District Acts of both California and Utah, while giving the power to the districts to lease or sell water to owners of agricultural land without the limits of the cities, were primarily designed to enable a number of cities to combine in order to secure a water supply in no way weakens the force of the decisions sustaining these acts as authority for the public and ''quasi-municipal'' character of the districts formed under our act.

██ The relator has not cited any constitutional provision which he contends is expressly violated by the creation of this district for public purposes in the form of a quasi-municipal corporation, and we are satisfied that none exists. The general rule is stated in vol. 1, McQuillin on Municipal Corporations (2d ed.), page 387, section 134, as follows: ''In the absence of constitutional limitations the state legislature may create any kind of a corporation to aid in the administration of public affairs and endow such corporation and its officers with such powers and functions as it may deem necessary.''

In the case of *People ex rel. v. Fleming,* 10 Colo. 553, 16 Pac. 298, this court held that municipalities such as cities, towns and districts, may be granted any power within the discretion of the legislature which is not prohibited by the Constitution, stating:

''There is no provision in the Constitution expressly prohibiting the delegation of such power to individuals, and there is no provision requiring the delegation of such power to be made to political, legislative, or other bodies, from which such prohibition may be implied. Whether

such power shall be delegated to boards of county commissioners or other local bodies, or to some individual, or collection of individuals, seems to us to be purely a question of policy or expediency; with which questions courts have nothing to do, in determining the validity of a statute. * * *

"It is well settled in this state that the Constitution is not a grant of power to the legislature, but that the legislature is invested with plenary power for all the purposes of civil government, and that the Constitution is but a limitation upon that power. The power to confer upon the persons named in the general law for the incorporation of cities and towns authority to do certain acts therein specified, not being prohibited by the Constitution, such law is not unconstitutional by reason of the delegation of such authority."

To the same effect are the cases of *People ex rel. v. Earl,* 42 Colo. 238, 94 Pac. 294; *People ex rel. v. Hall,* 8 Colo. 485, 9 Pac. 34; and the case of *People ex rel. v. Mc-Nichols,* 91 Colo. 141 (13 P. [2d] 266), where the court at page 147 said: "The Legislature has plenary power to legislate, subject only to the limitations imposed by the Constitution of the United States and that of the state. Unless its power is thus limited, it may impose upon municipalities a liability for state or general purposes."

This conclusion also is in accord with the overwhelming weight of authority in the United States.

■ Section 15 of our conservancy act is as follows: "Section 15. Classification of Taxes and Assessments— Powers. In addition to the other means of providing revenue for such districts as herein provided, the Board shall have power and authority to levy and collect taxes and special assessments for maintaining and operating such works and paying the obligations and indebtedness of the district by any one or more of the methods or combinations thereof, classified as follows:

"Class A. To levy and collect taxes upon all property within the district as hereinafter provided.

"Class B. To levy and collect assessments for special benefits accruing to property within municipalities for which use of water is allotted as hereinafter provided.

"Class C. To levy and collect assessments for special benefits accruing to lands within irrigation districts for which use of water is allotted as hereinafter provided.

"Class D. To levy and collect assessments for special benefits accruing to lands for which use of water is allotted as hereinafter provided."

Under Class A the legislature has authorized districts to levy and collect general taxes on all property, real and personal, within the district, and in Classes B, C and D to levy and collect assessments for special benefits.

The express authorization for power to levy taxes conferred by the legislature upon the district here involved is found in article X, section 7, of the Colorado Constitution, which reads as follows: "Municipal taxation—The general assembly shall not impose taxes for the purposes of any county, city, town *or other municipal corporation,* but may by law, vest in the corporate authorities thereof respectively, the power to assess and collect taxes for all purposes of such corporation."

In this grant of power lies the distinction between a water conservancy district under this act and the irrigation districts authorized by the Colorado Irrigation District Act of 1905, as amended, supra. The public character of the water conservancy district is the occasion for this difference. This distinction was made clearly evident by the words of this court in the case of *Interstate Trust Co. v. Montezuma Valley Irr. Dist.,* 66 Colo. 219, 181 Pac. 123, where it is stated: "Irrigation district assessments are distinguished from taxes levied by a municipality for water works, and taxes levied for maintenance of schools, because of the public nature of the latter. In the latter cases there is a direct public benefit, general in character, for which the public at large, through general taxes levied for that purpose, must pay."

This dissimilarity also discloses the inapplicability as authorities on the questions here, of many decisions such as *Stephenson v. Pioneer Irr. Dist.*, 49 Ida. 189, 288 Pac. 421, and *Anderson v. Grand Valley Irr. Dist.*, 35 Colo. 525, 85 Pac. 313, cited by relator to the effect that an irrigation district operates in a proprietary rather than a public capacity. Upon the same basis the decision in the case at bar in no manner can affect the status of the law relating to irrigation districts in this or any other particular.

The relator contends that the due process clauses of the federal Constitution (the Fourteenth Amendment) and the Colorado Constitution (Art. II, §25) are contravened by numerous provisions of the Water Conservancy Act.

Under this head it is said the act is fatally defective because no appraisal of benefits or hearing thereon is provided either as to the general mill levy or special assessments. It is unquestionably the general and well established rule, as announced in the leading case of *Village of Norwood v. Baker,* 172 U. S. 269, 19 Sup. Ct. 187, 43 L. Ed. 443, that special assessments cannot exceed the benefits conferred. The relator seeks to invoke this rule as applying to the general taxes authorized, by assuming that the district created is a special assessment district for a local purpose, and that such tax in reality is a special assessment. As has been pointed out, this assumed analogy is erroneous.

The district is a quasi-municipal corporation formed for a public state purpose and the mill levy tax authorized in sections 15, 16 and 20 of the act is an ad valorem tax based upon the same valuations as all general taxes, for a public purpose and not an assessment for benefits as in the case of irrigation and drainage districts, the Moffat Tunnel Improvement District and in flood control districts formed under the Conservancy Act. This conclusion is in accord with the decisions on the precise point by the Supreme Courts of California and Utah upholding the constitutionality of the Metropolitan Water District Acts

of these states. *City of Pasadena v. Chamberlain*, 204 Cal. 653, 269 Pac. 630, and *Lehi City v. Meiling, supra*. For an able and detailed statement of the grounds upon which this principle is founded, reference is made to these opinions. To the same effect is *Henshaw v. Foster, supra; Miller & Lux v. Board of Supervisors*, 189 Cal. 254, 208 Pac. 304, and *In re Orosi Public Utility District*, 196 Cal. 43, 235 Pac. 1004.

The law is well settled that the power of general taxation for public purposes does not infringe upon the due process clause of the federal or state Constitutions. 12 C. J. 1255; *Green v. Frazier, supra*.

Our determination that the general tax authorized is for a public purpose and is not a special assessment, in effect disposes of the specially urged contention, based generally upon the objection last discussed as to lack of benefits, that the order of court creating the district and the act itself violate the due process clauses as to the owners of: (1) Real property within the limits of incorporated cities and towns lying within the district; (2) lands not susceptible of irrigation; (3) lands already having an adequate water supply; and (4) personal property. All of these owners are subject to the general ad valorem tax by reason of the situs of their property in the same manner as property owners in ordinary political subdivisions are liable for taxation to support the diversified activities of such subdivisions, which liability is not contingent upon direct benefits, and as to such tax, as we have indicated, the due process clauses have no application. Under the terms of the act personal property under no circumstances can be directly liable for the special assessments therein contemplated. The liability of land owners under classes 2 and 3 for special assessments can arise only by a contractual relation initiated by them, and those in class 1 can be affected solely when the town or city in which they reside assumes the special assessments by agreement, in which event the urban land owner, in common with his fellow residents, is subject only to a

corporate tax imposed by the authorities of said city or town to pay the special assessment for the domestic water supply contracted for, and for which a general liability would exist if domestic water was secured. To this situation, as we shall shortly indicate, the due process clauses have no application.

We now refer to the power conferred by the Water Conservancy Act to levy special assessments. As a general proposition special assessments are permitted by authorized governmental agencies upon the theory that the property against which they are levied derives some peculiar benefit by reason of the projected improvement different from that enjoyed by other property in the community in which the improvement is to be made. *Santa Fe Land Imp. Co. v. Denver*, 89 Colo. 309, 2 P. (2d) 238. The so-called assessments for special benefits provided for in Classes B, C and D of section 15 of the act are unique in character and are not directly analogous to special assessments as they generally are known in ordinary local improvement districts. This difference lies in the fact that under the act the liability for these assessments can arise only by the voluntary act of the individuals and corporations affected, whereas in ordinary cases the special assessments are imposed upon the property owners involuntarily on the basis of the benefit fixed by some public board or authority. In effect, the individuals, cities, towns, irrigation districts and mutual ditch companies who become liable for such special assessments through agreement with the water conservancy district, themselves ascertain the amount of the benefit and the extent of their liability in applying for the water which they deem necessary for their purposes. These contracts are the basis for the lien created by the act against the property of the applicant for water. The terms of an act authorizing such assessments cannot be held violative of due process of law, as each individual landowner and designated corporation agrees to process before he or it becomes subject to any special assessment.

■■■ Even, however, if the assessments provided by the act are deemed to be special assessments in the narrowest and ordinary sense, there is still no violation of the due process clauses by the act.

"The constitutional provision relative to 'due process of law' is fully complied with when the property owner is afforded an opportunity to be heard and test the validity of a special assessment and the proportion of the general cost of the improvements which shall be assessed against his property. 25 Enc. Law, 2d ed., 1173; *Brown v. City of Denver,* 7 Colo. 305; *Fallbrook Irr. Dist. v. Bradley,* 164 U. S. 112; *Pittsburgh Ry. v. Board,* 172 U. S. 32 (45); *Bauman v. Ross,* 167 U. S. 548 (590)." *Denver v. Kennedy,* 33 Colo. 80, 91, 80 Pac. 122.

Under the provisions of sections 6 and 7 of the act, the property owners of the district have notice, and by filing protesting petitions are afforded an opportunity to be heard with respect to the organization of any district before its formation. Prior notice and hearing by the board is provided before special assessments may be made in Classes B, C, and D, as set forth in each of sections 17, 18 and 19. By section 21 of the act, in advance of the time the board fixes the amount of the annual tax or assessment, every taxpayer, whether general or special, is given notice and opportunity to be heard on objections to assessments, with right of appeal from the findings of the board to the district court. In the light of these provisions an opportunity is afforded to all interested parties to be heard on the subject of special assessments, and the act cannot be said, with respect to the sections under consideration, to violate the due process clauses of either the federal or state Constitutions. *Milheim v. Moffat Tunnel District, supra.*

■■■ It is also said the act violates the due process clauses in providing for cumulative levies of general taxes and special assessments to meet defaults and deficiencies. It has very generally been held that such levies could not

be made for the purpose of paying deficiencies arising from a nonpayment of taxes in local special improvement districts such as irrigation and drainage districts. *Interstate Trust Co. v. Montezuma Valley Irr. Dist.*, supra; *Wilcox & Son v. Riverview Drain. Dist.*, 93 Colo. 115, 25 P. (2d) 172; *Divide Creek Irr. Dist. v. Hollingsworth*, 72 Fed. (2d) 859, 96 A. L. R. 937; *McNeil v. Denver-Greeley Val. Irr. Dist.*, 80 Fed. (2d) 929. These decisions are based upon the theory that the assessments levied in a local special improvement district cannot exceed the benefits conferred upon the property involved. The distinction between such a district and the one under consideration has been heretofore pointed out and it is apparent, we believe, that these decisions are not definitely controlling as to the Water Conservancy Act or the districts created thereunder. It would seem certain that as to the general mill levy tax authorized, the objection is not tenable. As was mentioned in connection with the preceding question, the assessments provided for the act under consideration have their inception in the voluntary act of the individual or corporation later to be charged therewith, and for this reason, as we have stated, do not violate due process. If, as counsel for respondents say will be the case, the contract or agreement creating this liability includes a provision to the effect that the applicant will also answer for deficiencies and defaults, the subsequent imposition of assessments to cover these items against such an applicant will not be a violation of due process of law, since the liability arose through the voluntary act of the party charged. In the case of *Murdock v. City of Cincinnati*, 44 Fed. 726, where the petitioner agreed to answer for any deficiency in the collectibility of the assessment caused by insufficiency of valuation of property of those abutting owners not signing the petition, it was held that the previous request to be affected by the exercise of power conferred by law upon public officials, as evidenced by the contract, is a substitute for notice, and the proceedings

taken in conformity therewith and the provisions of the law providing for the same, are not subject to the objection of being wanting in due process of law for lack of notice or an opportunity of hearing by the petitioner. However these things may be, no contracts creating an assessment liability have been executed and no deficiencies or defaults now exist, in view of which we will not attempt to prejudge this question which may become a proper subject for determination if and when the suggested contingencies arise.

 Section 22 provides that all taxes and assessments are, until paid, a perpetual lien on a parity with the tax lien of general, state, county, city and town taxes, thereby importing a priority over other liens of all kinds. Section 19 creates a "perpetual tax lien" for Class D assessments.

Relator does not seriously question these provisions as they pertain to the general ad valorem tax and they appear not subject to challenge. 61 C. J. 928. As to the assessments, however, it is submitted that *unless* by the allocation of water to a tract of land, under section 19 of the act, the *right to the use of water attaches to and follows the tract of land* to which it is so allocated, so as to becomes subject and subordinate to existing, as well as future, mortgages and other contract liens, the act is unconstitutional against the holders of such existing mortgages and other contract liens upon the basis that it impairs the obligations of their contracts, denies them due process and equal protection of the laws under both the state and federal Constitutions. The relator seems to concede the general rule to the effect that ordinarily a statute giving priority to liens for public improvements over pre-existing contractual liens is thereby not rendered unconstitutional, and argues that such statutes are sustained upon the theory that the property affected has been inherently improved by the benefits conferred through the making of the improvement for which the assessment is levied, so

that, in effect, it thereby has an added value which is available to the holder of an antecedent lien or mortgage because of which he cannot object to the subordination of his rights. Conversely, it is argued, that if the allotted water for which the assessments are made in the conservancy districts, does not permanently attach to and follow the land, there can be no compensating benefit to legally justify the priority of the assessment lien. Section 28 of the act, giving the board power to declare forfeitures of the right to use water upon default, and to resell, lease or otherwise dispose of water upon which forfeiture has been declared, to transfer, allocate or reallocate the use of water on lands within the district, will make it possible, it is said, for the board to take away from the lands of a subscribing owner the water contracted for and still leave the assessments therefor superior to that of a pre-existing lien or mortgage.

On the other hand, counsel for the respondents staunchly proclaim that the water rights allocated are attached to the land and become a part of it by reason of which they claim there can be no constitutional infringement. It seems certain to us that counsel for neither side can predict with accuracy at this moment the precise terms and effect of the water users' contracts as to this point, nor predict with certainty the administrative course of the board under the permissible powers granted. The issue cannot be decided on possibilities and we, therefore, reserve its determination until it regularly comes before us.

It is next asserted that the act delegates non-judicial functions to the district court, in violation of article III of our state Constitution. Sections 3 to 12 of the Water Conservancy Act, providing for the organization of the districts through the agency of the district court, are substantially the same as sections 2 to 11 of the Conservancy Act of 1922 of Colorado, supra. In the case of *People ex rel. v. Lee,* 72 Colo. 598, 213 Pac. 583, this court ruled that these sections of the 1922 Conservancy Act,

supra, did not contravene article III of the state Constitution, and at page 610, quoted a second time with approval the following statement from *State v. Public Service Com.*, 94 Wash. 274:

"The constitutional division of all governmental powers into legislative, executive and judicial is abstract and general. Their complete separation in actual practice is impossible. The many complex relations created by modern society and business have produced many situations which can be adequately met only by vesting in the same administrative officers or bodies powers inherently partaking, to some extent, of any two or all of these three functions." And added, "Upon the authorities above cited, we conclude that the act does not violate Article III of our Constitution. It does not delegate legislative or administrative powers to the district court, within the meaning of the constitutional prohibition thereof, since judicial powers are vested by the statute in the court organizing the district, and the administrative powers complained of are incidental to the judicial functions vested."

The relator argues that the conclusion reached by this court in *People v. Lee, supra,* is erroneous and cites the case of *In re Verdigris Conservancy District v. Objectors,* 131 Kan. 214, 289 Pac. 966, as properly stating the law on the subject. He concedes that to reach the conclusion adopted in the Kansas case the Lee case must be overruled. This we are not inclined to do, and, without an extended discussion on the subject, approve the questioned provisions of our Water Conservancy Act on the authority of that decision. We might add that the sections under consideration were originally taken from the Conservancy Act of Ohio, from which they were transposed, first, to our 1922 Conservancy Act, supra, and later to the act before us. In the case of *Miami County v. City of Dayton,* 92 Ohio St. 215, 110 N. E. 726, as against this precise objection, the constitutionality of the Ohio act was sustained by the Supreme Court of that state. The same

conclusion upon this point, under practically analogous constitutions, has been reached by the Supreme Courts of Washington, Indiana, Illinois, Montana and Minnesota. In support of his position the relator also has cited the case of *Denver v. Lynch,* 92 Colo. 102, 18 P. (2d) 907. This case is not authority on the points here involved. There the legislature attempted to delegate judicial powers to boards of county commissioners to be exercised concurrently with the judge of the county court. It was by reason of the circumstance of the attempted conferring of judicial power upon the officers of other departments of government, that the act was held to be unconstitutional. The court holding, as stated in the opinion, ''that the legislative department is powerless to confer judicial duties upon the officials of other departments.''

 Section 21 grants to the property owners the right to appeal from a decision of the board fixing annual assessments. The function of the court in the determination of this question is purely judicial. Similar provisions, giving the right of appeal to the courts from findings of value or erroneous assessments appear in many of our revenue laws and contravene no section of the Constitution.

 Incidental to this point, but separately urged, is the objection that the order of court forming the district is invalid because the court did not have jurisdiction to create a district which extended beyond the limits of the Eighth Judicial District, as the one in question does. We think this objection untenable. Even as to the civil jurisdiction of the county or district courts, in strictly judicial matters, no territorial limit is fixed by the Constitution. *Fletcher v. Stowell,* 17 Colo. 94, 28 Pac. 326. The district court's jurisdiction, wholly dependent upon statute, to enter water adjudication decrees for ditches outside its judicial district, has been repeatedly upheld by this court. *Louden Co. v. Handy Co.,* 22 Colo. 102, 43 Pac. 535; *Broadmoor Co. v. Brookside Co.,* 24 Colo. 541, 52 Pac. 792; *Farmers Co. v. Rio Grande Co.,* 37 Colo. 512, 86 Pac. 1042.

And section 3 of the conservancy act directly confers on district courts jurisdiction "to establish water conservancy districts which may be entirely within or partly within and partly without the judicial district in which said court is located." It would seem, therefore, that there can be no valid objection on this score to the powers conferred upon, and exercised by, the district court in this instance.

It is further objected that the act denies to the property owners within the district any voice with respect to the government of the district, contrary to the provisions of sections 12, 13 and 14 of article XIV of the Colorado Constitution. As we have seen, the act reposes the government of the district in a board of directors to be appointed by the district court. The argument upon this point is based upon the assumption that every citizen residing within the district should be entitled to vote in the election of the persons by whom the affairs of the district are to be conducted. However democratic this theory, this right is not guaranteed by the Constitution to the electors of municipal corporations. Section 12, article XIV, of the state Constitution is as follows: "Other officers.—The general assembly shall provide for the election *or appointment* of such other county, township, precinct and municipal officers as public convenience may require; and their terms of office shall be as prescribed by law, not in any case to exceed two years."

It was said in the case of *Milheim v. Moffat Tunnel District, supra,* at page 277: "Section 12 of article XIV of the Constitution, thus cited, specifically provides that the general assembly shall provide for the election *or appointment* of municipal officers. See also *In re Senate Bill,* 12 Colo. 188, 21 Pac. 481. This is a sufficient answer to the claim that the term 'corporate authorities' does not include appointees to municipal offices."

In the case of *People v. Lee, supra,* at page 607, the court stated: "Whether owners of land have any right to participation in the administration of quasi-municipal

corporations 'by vote or otherwise' is a political question merely. The right of the legislature to create a quasi-municipal corporation and provide for the manner of its administration and the personnel of its officers in any manner it may see fit, is well established.''

The same conclusion was reached by the California Supreme Court in the case of *Golden Gate Bridge & Highway Dist. v. Felt, supra,* construing the California Constitution, which on this point is very similar to ours.

Section 13, article XIV of the state Constitution provides for the organization of cities and towns. It has no reference whatever to the organization of ''other municipal corporations,'' and does not in any manner refer to the classification of municipal corporations other than cities and towns, in which classification we have determined this district does not belong. *Milheim v. Moffat Tunnel District, supra.*

Section 14 of article XIV provides that cities and towns created under special or local laws may elect to become governed by the general laws of the state relating to such corporations, and obviously can have no application whatever to the water conservancy districts under consideration.

Also foreclosed by *Milheim v. Moffat Tunnel District,* and *People v. Lee, supra,* is the objection that the act violates section 35, article V of the Constitution, which provides: ''The general assembly shall not delegate to any special commission * * * any power * * * to levy taxes.'' It was there determined that the respective boards of directors of districts with duties and powers of the character of the board here did not constitute a ''special commission'' within the prohibition of the constitutional provision.

Section 14, article X of our Constitution, providing: ''Private property shall not be taken or sold for the payment of the corporate debt of municipal corporations,'' has no application to the matter before us. This section only means that a creditor of a municipality may

not levy upon and sell the private property of individuals within the corporation to pay the debt of the municipality. There can be no doubt that a municipal corporation, under legislative authority, has the power to assess and collect taxes and, incidentally, special assessments for all the purposes of such corporation. Art. X, §7, Constitution.

Neither does the act contravene section 8, article XI of our Constitution. This provision by its terms relates only to cities and towns, and prohibits them from contracting loans or debts without submitting the question to its electors. It has no application to an independent entity such as this conservancy district. *Milheim v. Moffat Tunnel District, supra.*

Nor does it affect cities and towns within the district which create a debt to purchase water therefrom payable by assessment under Class B, since debts contracted for the supplying of water to a city or town are expressly excepted from the prohibition of the section by the constitutional provision itself. The status of these assessments in such a town or city was pointed out in *People v. Lee, supra,* page 612, in the following language:

"The debt or obligation resting on a city by reason of the levy of an assessment made against it by the Conservancy District would not be met by a special assessment of such city itself, but the city must pay its assessment by the levy of a tax at a uniform rate upon all the taxable property within its boundaries. * * *

"Such taxation, and the indebtedness involved, is not such taxation and indebtedness as is contemplated by section 8, article XI of the Constitution, above quoted. That section applies only to taxation and indebtedness incurred for the governmental purposes of the city. 25 R. C. L. 92. Here the tax is for the purpose of paying an assessment to carry out the purposes, not of the city but of the Conservancy District."

The general tax authorized by the act is levied by the district for its own purposes, and is not a city or town tax in any sense. An urban taxpayer is obligated

for it by the same process that makes him liable for county and state taxes on his town property.

It also may be observed that subtitle VII of the act relating to bonded indebtedness requires the approval of the taxpaying electors of the district to the issuance of any bond, incurring indebtedness or any contract proposition.

It is argued that the act constitutes a pledging of the credit of the cities and towns within the district in aid of (1) a public corporation, and (2) a private corporation, contrary to section 1, article XI of the Colorado Constitution.

On the first point it is said that the placing of district taxes on a parity with general, state, county, school district and municipal taxes, as the act provides, will have the effect of forcing taxpayers of cities and towns therein to pay district taxes as a condition to the payment of general taxes and thereby constitute a pledging the credit of these municipalities in aid of the district, a public corporation. Adroit as is this argument, it is without merit from a legal standpoint, since the question of the priority of tax liens is for legislative determination, which must control here. *People v. Denver,* 85 Colo. 61, 273 Pac. 883.

As to the second proposition, the relator argues that in the construction of the project involved both the district and all the towns and cities therein, in effect, will have pledged their credit in the aid of whatever corporation, public or private, secures surplus electric power from the United States. This argument is based upon several matters of assumption. The legislature provided, section 13 (j), as was within its discretion, that the district or the board shall not have power to generate, distribute or sell electric energy except for the operation of the works and facilities of the district. The relator assumes that by reason of available water power much more electricity can be produced than the district uses will consume. It is then argued that the United States, the

potential source for financing the project, through contract may reserve the right to excess power, install generating machinery and sell electricity to a public or private corporation. As stated, it is asserted the resulting relationship between the district and such private or public corporation is within the constitutional prohibition last mentioned and amounts to a sort of partnership, condemned in the case of *Lord v. Denver,* 58 Colo. 1, 143 Pac. 284, L. R. A. 1915 B, 306, Ann. Cas. 1916 C, 893, where the court held a projected agreement between the city of Denver and a railroad company for the construction of the Moffat Tunnel as being prohibited by these provisions of the Constitution. Under the record here it is not certain that the contingencies assumed by the relator will ever occur. It would seem definite, however, that there is nothing in the act which authorizes the district to contract with private or public corporations for the purposes specified, nor gives to such a corporation any interest in the district works or project.

 As the matter stands, therefore, it is apparent that the act itself does not transgress in the particulars urged. If future developments should present a question on this issue, it may then be presented. It might be added that if negotiations are consummated between the district and the United States whereby the latter finances the project, even if it be considered that the district thereby pledges its credit in aiding the United States in the construction of the project, these constitutional provisions are not violated, since in such a capacity the United States is neither a public nor a private corporation. *McNichols v. Denver,* 101 Colo. 316, 74 P. (2d) 99.

 Section 25 provides for the sale, lease or other disposition of water for perpetual use by the board; section 13 (g) gives the board the power to fix the rates for water disposed of, and sections 17, 18 and 19 relating to the levy of assessments under Classes B, C and D, generally give the board the power to fix and determine the

rates per acre foot and the terms upon which the water contracted for shall be sold.

It is argued that these provisions are in conflict with section 8 of article XVI of the Constitution providing that the county commissioners, under statutes to be adopted by the legislature, shall have power to establish the rates to be charged for the use of water. Under the present state of the administrative development of the district it is impossible to determine whether or not this constitutional provision has application to the district in the exercise of the powers mentioned.

There seems to be nothing in the Constitution which would prohibit the legislature from conferring upon the district, in the first instance, the right to determine the charge to be made for the sale or leasing of water. This question will arise, if at all, when the water users and the district board of directors cannot agree on these matters. Such a disagreement, in effect, is a condition precedent to invoking the power of the county commissioners (*Wheeler v. Northern Colorado Irr. Co.*, 10 Colo. 582, 17 Pac. 487), and the board could act only on the petition of an interested party. *McCracken v. Montezuma Water & Land Co.*, 25 Colo. App. 280, 137 Pac. 903. The parties ultimately involved in the construction of the project, the character of the ownership and interest of the water users in the district and in the waters made available through the project, and the nature of the charges made therefor will all be factors in the ultimate determination of this problem. For instance, if the project is constructed by the district through cooperation with the United States and its Bureau of Reclamation, under a recent decision of the United States Supreme Court in *Ickes v. Fox*, 300 U. S. 82, 57 Sup. Ct. 412, 81 L. Ed. 525, the water rights will in fact be owned by the landowners or users and not by the United States or the district, although the actual title thereto will be in the Reclamation Bureau. In such an event, the charges made to the water users might be said to be a capital or purchase price cost and not a rate

to be charged for the use of water within the meaning of the Constitution. In *Wanamaker Ditch Co. v. Pettit,* 89 Colo. 344, 3 P. (2d) 295, we held that the statutes enacted pursuant to the constitutional provision under discussion and concerning the rate of charge for water, had no application to one appropriating and using water through his own ditch nor to his successors in interest, so that under our own decisions the ultimate character of the water users' interest is of controlling importance. In any event, these matters have no bearing upon the primary validity of the organization of the district or the act authorizing it and, at the most, the district administration would be subject only to the regulatory power of the county commissioners.

In view of the importance of the project, the statewide interest therein and the likelihood that districts may be formed in other sections of the state, except as to corollary matters, we have considered all of the objections to the act urged by the relator, which has resulted in a more detailed and lengthy opinion than would, perhaps, be justified under ordinary circumstances.

We have refrained from discussing the policy of the act or the wisdom of its provisions, since within the lawful limits of its discretion these are matters of legislative concern over which we have no control. Neither must our holding that the act itself is constitutional be taken as a conclusive determination that the district may not transgress through the manner in which it may exercise some of the powers conferred.

The demurrer of relator is overruled and the writ discharged.