[Civil No. 4568.  Filed February 11, 1944.]

[145 Pac. (2d) 837.]

H. D. HALLENBECK and KATHERINE HALLEN-
BECK, Husband and Wife, Appellants, v. YUMA
COUNTY, a Political Subdivision of the State of
Arizona; GILA VALLEY POWER DISTRICT,
a Municipal Corporation; and R. E. LEE, JR.,
Yuma County Treasurer and *ex-officio* Treasurer
of Gila Valley Power District, a Municipal Cor-
poration, Appellees.  MINERS AND MER-
CHANTS BANK, a Corporation, and C. W.
TAINTOR, Intervener-Appellees.

Mr. William H. Westover, for Appellants.

Mr. Peter C. Byrne, County Attorney and Mr. A. J. Eddy, Deputy County Attorney, for Appellees, Yuma County and R. E. Lee, Jr., Treasurer.

Mr. R. C. Bennett, for Appellee Power District.

Mr. R. N. Campbell, for Intervener-Appellee Bank.

Messrs. Gust, Rosenfeld, Divelbess, Robinette & Coolidge, for Intervener-Appellee Taintor.

UDALL, Superior Judge.—The principal question for determination on this appeal is whether a sale of realty to the sovereignty for delinquent state, county and power district taxes prevent the land sold from

being taxed for power district purposes after tax sale has been completed and the land sold has been returned to private ownership. A better understanding of the problem involved will be had by a brief recitation of the facts:

The Gila Valley Power District is a corporation organized under Chapter 173, Session Laws of Arizona 1919. (Now appearing in the Arizona Code Annotated of 1939 as Art. 10, being sections 75–1001 *et seq.*). In 1923 the electors of the District subjected the lands therein to a bond issue in the sum of $300,000 payable over a period of thirty years; and thereafter the Board of Supervisors of Yuma County levied against the real property of the District an assessment to retire the bonds as they became due, and pay the interest on those outstanding. State and County and Gila Valley Power District taxes were duly and regularly levied against the property of the District for the years, 1929, 1930, 1931, 1932, 1933, 1934, 1935, 1936, and 1937.

Situate within the District and against which taxes were so levied was that certain parcel of land, described as: Lot 1, Section 1, Township 9 South, Range 19 West, G. & S. R. M., Yuma County, Arizona.

The taxes and assessments for the year 1929 not being paid against this property when due, the County Treasurer, pursuant to law, sold the same on December 15, 1930, to the State of Arizona.

The property was thereafter and on December 15th of each succeeding year sold to the State by the County Treasurer for delinquent state, county and Power District taxes for the years 1931 to 1937, inclusive. No redemption was made from these tax sales by the owner of said property or any one else, and after full compliance with the statutes as to notice of application for deed, right to redemption, etc., on August 25, 1937, the County Treasurer executed

and delivered to the State of Arizona his deed to this property.

On January 16, 1939, this realty was regularly sold by the Board of Supervisors of Yuma County to the appellant, H. D. Hallenbeck, and a deed issued to him.

For the fiscal year of 1941–2 the Board of Supervisors finally fixed the amount necessary to be raised by assessment against the real property in the district in the sum of $164,698.24, and a levy was made upon the lands in the district to raise said sum. Included within the above amount were three item aggregating $128,910.24 of delinquent interest and delinquent sinking funds which had been ordered included in the budget of the district by a mandate of the Superior Court of Yuma County in a mandamus action, being cause No. 10253.

The property plaintiff purchased from the State was included in the property assessed to pay said sum, and there was levied and assessed against said property for district taxes the sum of $187.12. This amount the plaintiff paid under protest and then brought this suit to recover the entire amount of power district taxes he had been forced to pay. The suit was originally filed against Yuma County; the separate applications to intervene, of the Miners and Merchants Bank, a corporation, and C. W. Taintor, were granted on the grounds they were owners of bonds of the District. Thereafter the plaintiffs filed an amended complaint bringing in the other named defendants. The defendant, Gila Valley Power District, (herein referred to as the District) and the interveners, made motions to dismiss plaintiff's complaint on the grounds that it failed to state a claim upon which relief could be granted. After full hearing had the court, on June 18, 1942, granted the mo-

tions to dismiss, and an appeal was then taken to this court.

The parties will be hereafter referred to as they were in the lower court, and inasmuch as the interveners joined with the defendants in filing appellee's brief, all will be referred to as defendants.

■ The question of priority of liens between State and County taxes as against power district taxes is not involved in this case. We readily agree with plaintiffs' proposition of law that State and County taxes are prior and superior to all other liens and incumbrances, except liens or incumbrances held by the State of Arizona. Section 73–506, Arizona Code Annotated 1939, expressly so provides, and that was our holding in the case of *Town of Holbrook* v. *Koury,* 50 Ariz. 526, 73 Pac. (2d) 698.

■■ Furthermore, as to the next legal proposition, we agree that a sale by the County Treasurer of real property for delinquent State and County taxes discharges all liens and assessments, including power district taxes, theretofore levied against the property sold. Sec. 73–506. When property vests in a purchaser under a tax sale prior tax liens of all kinds are discharged. *Sears, Roebuck & Co.* v. *Maricopa County,* 41 Ariz. 304, 17 Pac. (2d) 1096; *Ingraham* v. *Forman,* 49 Ariz. 29, 63 Pac. (2d) 998; *Maricopa County* v. *Arizona Tractor & Equipment Co.,* 56 Ariz. 518, 109 Pac. (2d) 618; *Board of Sup'rs* v. *Miners, etc., Bank,* 59 Ariz. 460, 130 Pac. (2d) 43.

■ By their fourth assignment of error the plaintiffs seek to raise the validity and legality of the district tax levies for the fiscal year 1941–2. This levy formed the basis of the tax which the plaintiff is now seeking to recover. This was not made an issue in the lower court and hence cannot now be raised for the first time in this court. *City of Glendale* v. *Coquat,* 46 Ariz. 478, 52 Pac. (2d) 1178, 102 A. L. R. 837. Fur-

thermore, the validity of this identical levy was raised in the recent case of *Board of Supr's* v. *Miners, etc., Bank, supra,* involving the same power district and we remanded that case back to the Superior Court of Yuma County for further proceedings. We, therefore, refuse to consider this question on this appeal and express no opinion as to the merits thereof.

The plaintiffs' amended complaint alleges that as a result of the tax sale process and the ultimate vesting of the title in them, that "said property was relieved from any further liability on account of said bonded indebtedness, and that said property since January 16, 1939, (date of deed to plaintiff) has not been and is not now subject to any assessment for the payment of bonded indebtedness or interest thereon, or for any purpose on behalf of said Gila Valley Power District." The four assignments of error and conclusions of law based thereon, which form the basis of this appeal, are somewhat uncertain and do not seem to go as far as the complaint, being somewhat limited to the contention that only the taxes levied for delinquent interest, delinquent sinking fund, and for bonded indebtedness of the district were illegally collected. We shall however, necessarily determine the basic question raised by the pleadings in the lower court of whether plaintiffs' lands were rendered immune from future district levies by sale thereof for delinquent state, county and district taxes.

Upon statutes not greatly different in language from the Arizona Power District Act, and having the same general objects, the courts of various states have reached diametrically opposed conclusions upon the identical question here presented. Practically all of these district laws, usually covering irrigation, reclamation, or power, are patterned after the Wright Act of California (St. Cal. 1887, p. 29), the constitu-

tionality of which has been established by numerous decisions of the California Court and by the decision of the Supreme Court of the United States in *Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369.

The Supreme Courts of Colorado, Utah and Montana (although the latter State has held both ways on the question) have held, in substance, that the district indebtedness, bonded and operative, merely constitutes special assessment obligations for the payment of which each tract of land is bound to pay only its proportionate part. Some of the decisions rest largely upon the proposition that no lien, in the absence of specific legislation upon that precise point, can have the high sanction of a governmental tax for purposes of government, and that a tax sale effectually sweeps away all rights except the right of the sovereign to tax for its own governmental purposes; and that therefore the liability of any land within the district to be further subjected to a tax for district bond purposes is forever shorn away by the completion of the tax sale process. The leading cases from the above jurisdictions so holding are: *Interstate Trust Co.* v. *Montezuma Valley Irr. Dist.,* 1919, 66 Colo. 219, 181 Pac. 123; *Nelson* v. *Board of Com'rs of Davis County,* 1923, 62 Utah 218, 218 Pac. 952; *Hanson* v. *Burris,* 1935, 86 Utah 424, 46 Pac. (2d) 400; *State* v. *Board of Com'rs of Cascade County,* 89 Mont. 37, 296 Pac. 1. These decisions clearly represent a minority view, and their practical effect has been to permit unfortunate landowners in districts in financial distress to find an escape route, approved by judicial sanction, in meeting their obligations. Some of the states where this harsh rule applied have circumvented it by adopting acts based upon the more recent California Conservancy Act (Statutes 1927, c. 429, p. 694) which is based upon the same principles

as the Wright Act. These later acts have been held to authorize general obligations and the courts have sustained them as such. *Lehi City* v. *Meiling,* 1935, 87 Utah 237, 48 Pac. (2d) 530; *People ex rel. Rogers* v. *Letford,* 1938, 102 Colo. 284, 79 Pac. (2d) 274. The Montana Legislature directly repudiated the Cascade County case, *supra,* by legislation declaring that irrigation and drainage district assessments payable after the execution of a tax deed should be preserved. *Cascade County* v. *Weaver,* 1939, 108 Mont. 1, 90 Pac. (2d) 164.

The Supreme Courts of the other Western States that have had occasion to pass upon the question, as well as two of the United States Circuit Courts of Appeals, have taken the position, which represents the majority rule, that district obligations, similar to those involved here, are general obligations for the payment of which the whole district is obligated; and that a lien upon a specific piece of property in the district arises only after an assessment has been levied. The leading cases supporting this view are: *Noble* v. *Yancy,* 1925, 116 Or. 356, 241 Pac. 335, 42 A. L. R. 1178; *Moore* v. *Gas Securities Co.,* 8 Cir., 1921, 278 Fed. 111; *State ex rel. Clancy* v. *Columbia Irr. Dist. of Stevens County,* 1922, 121 Wash. 79, 208 Pac. 27; *American Falls Reservoir Dist.* v. *Thrall,* 1924, 39 Idaho 105, 228 Pac. 236; *In re Lovelock Irr. Dist.,* 1929, 51 Nev. 215, 273 Pac. 983; *Dougery* v. *Bettencourt,* 1931, Cal. Sup., 2 Pac. (2d) 765. The Supreme Court of Montana has ruled both ways. In a wellwritten opinion, its earliest decision of *Cosman* v. *Chestnut Valley Irr. Dist.,* 1925, 74 Mont. 111, 238 Pac. 879, 40 A. L. R. 1344, established what has become the majority rule. Though the same tribunal later repudiated it, the Ninth Circuit Court of Appeals refused to follow the subsequent Cascade County case, *supra,* and held that the earlier Cosman case

had correctly construed their statute. *Judith Basin Irr. Dist.* v. *Malott,* 9 Cir., 1934, 73 Fed. (2d) 142, 97 A. L. R. 504.

Although this matter is one of first impression in this State, we cannot say that we believe either the majority or minority rule superior to the other, as that would be judicial legislation, which is never permissible. We have the responsibility of determining from the act itself on which side of the fence the legislature of Arizona placed our state when it enacted the Power District Act of 1919, unamended to this date. The intent of the legislature must govern, for as we stated in the case of *Ingraham* v. *Forman,* *supra* [49 Ariz. 29, 63 Pac. (2d) 999],

"The Legislature has plenary power (within constitutional limitations) over the subject of taxation and may provide for tax liens and fix the terms upon which such liens may be extinguished, and when that is done the legislative rule is binding and must be given effect."

In determining this question of legislative intent we are entitled to take into consideration the fact that at the time of the passage of our Power District Act in 1919, there had been only three cases determining this question, and each of these unqualifiedly held that irrigation district bonds issued under laws patterned after the California Wright Act were general obligation bonds. *Rialto Irr. Dist.* v. *Stowell,* 9 Cir., 246 Fed. 294; *Norris* v. *Montezuma Valley Irr. Dist.,* 8 Cir., 248 Fed. 369; *Condit* v. *Johnson,* 158 Iowa 209, 139 N. W. 477. The presumption is justified that the legislature in adopting a statute which had been judicially construed, adopted it with that construction in mind.

With this background let us then analyze the Power District Act of 1919 to see if we can determine therefrom the legislative intent. On the one hand the

plaintiffs strenuously urge three provisions of the Act as indicating that the legislature had definitely aligned Arizona with those states holding that the district indebtedness merely constituted special assessment obligations; in other words, with what we have termed the "minority rule." They point out:

(1) that the act provides: "all taxes or assessments levied under this chapter (article) are special taxes and shall be liens upon the lands against which they are assessed." Sec. 22. (All references as to section numbers refer to original Power Act of 1919)

(2) provision is made whereby individual tracts of land may be released from the bonded indebtedness. Sec. 21;

(3) that it is made the duty of the Board of Directors of the District to provide a fund for tax sale purchases of delinquent district lands; (Sec. 21) and that the district may become the purchaser thereof and hold title thereto. Sec. 24;

It must be admitted that most of the provisions just cited are peculiar to this act, and their counterparts are not found in the laws of the states whose courts have held that the bonded indebtedness created a general obligation; but we cannot consider these provisions alone without reference to the other provisions hereinafter set forth which have a contrary signification.

■ As to contention (1), *supra,* it is more superficial than real. General taxing powers and special taxing powers both emanate from the same source— that is, the sovereign power of the state delegated to local authorities. The difference between them is simply that general taxes are levied for all purposes, and that special taxes are levied for local or special purposes. There is no constitutional principle that prevents a special tax, even though it be levied for special benefits, from being levied upon the entire dis-

trict instead of being apportioned among separate lands of the area. *Fallbrook Irr. Dist.* v. *Bradley, supra.*

On the other hand, as is pointed out by the defendants, there are numerous provisions of the Act that are wholly inconsistent with the idea of the indebtedness being other than a general obligation. We summarize a number of the many more obvious ones, viz.:

(1) The bonds are not made a lien upon the lands within the district, but the taxes levied for the payment of the bonds are made such lien. Secs. 19, 22, 23, 24.

(2) The bondholders are given no power to enforce the payment of their bonds against the lands in the district, but are given the power to enforce the bonds against the district by *mandamus.* Sec. 22.

(3) The act contains express provision for the annual levy of taxes to pay the bonds. Secs. 21, 22.

(4) The act contains a provision that the bonds and interest thereon may be paid out of funds levied for other purposes when they are not needed for such other purpose. This is inconsistent with the theory that they are special assessment obligations. Secs. 21, 22.

(5) The act contains a provision that payment of district taxes may be made with matured interest coupons or warrants of the district at their par value. Sec. 23.

(6) The act provides for the withdrawal of lands from the district with the consent of the board of directors, but such withdrawal does not release the lands so withdrawn from any district contract obligation lien or charge for which it was or might become liable or chargeable had the order of exclusion not been made. Sec. 32.

(7) The bonds issued under the act are made "legal investments for all trust funds and for the

funds of insurance companies, banks, banking institu-, tions, and trust companies, and for the state and school fund, and whenever any money or fund may by law be invested in bonds of cities, counties, school district or municipalities in the state, such money or funds may be invested in said bonds of power districts.'' Sec. 35.

(8) The act provides that ''said bonds and the interest thereon, shall be paid by revenue derived from an annual assessment and levy upon the real property of the district, and the real property- of the district shall be and remain liable to taxation for such payments.'' Sec. 21.

(9) The act requires the estimates made for each year to include deficiencies in the payment of maturing bonds, interest, maintenance, operating and current expenses, Sec. 22, a provision so specific that it cannot be avoided as the Supreme Courts of Colorado and Utah in the cases herein cited avoided the less specific provisions of their Irrigation District Act.

(10) The bonds of power districts are authorized to be issued as the bonds of the district without any indication that they are payable out of a special fund. Sec. 19.

(11) The bonds of the district may be sold from ''time to time'' without restriction, except that they must be sold as to yield 90% of their face. Sec. 20. The fact that the extent of the lien is uncertain so long as any bonds remain to be sold is wholly consistent with the thought that the total obligation of the bonds is a general one and totally inconsistent with the theory that the debt represented by the bonds is apportioned, according to the ratio of the respective acreages, to each parcel of land in the district.

(12) The powers granted to the district are extensive. Thus, the district has the power to tax (Sec.

21); the power of eminent domain (Sec. 27); the power to purchase power systems and the authority to lease surplus power to nonresidents of the district for profit (Sec. 15); the power to condemn property (Sec. 16); and the power to sue, etc. (Sec. 18).

(13) The affairs of the District are conducted by the landowners in the district who must have the general qualifications of voters. (Sec. 7).

(14) Its bonds are declared to be negotiable (Sec. 19), a characteristic not ordinarily applicable to special assessment bonds.

In addition to the Power District Act itself there are other statutory provisions that help us in classifying such a district, viz.:

. Power districts are declared municipal corporations by the constitutional amendment adopted in 1940. Sec. 7, Art. 11, Session Laws of 1941, page 404.

Power districts are also put in the same class as irrigation districts for the purpose of receiving Government benefits. District Enabling Act, Sec. 75-1101, Arizona Code Annotated 1939.

By way of further illustration it appears to us then that there are two distinct types of liens created by such acts. First, a special assessment plan, typical of which would be: street improvement, such as the paving assessment we had under consideration in the case of *Town of Holbrook* v. *Koury, supra;* special improvement bonds; the Arizona Bond Act of 1919; sewer and lighting districts; and normally drainage districts, although in Arizona the latter type of district appears to fall under both types. All of the acts creating districts such as just described provide only for certain specific improvements, the cost of which is to be assessed upon the lands which are benefited thereby, and contain no provision for an organization extending beyond the time when the bonds or obligations are issued. We know of no act adopted by the

Legislature of Arizona providing that bonds should be paid out of special assessments in which provision was not made for appraisal of the benefits, a hearing upon such appraisal, and the definite fixing, and recording of the amount of such benefits before the bonds were issued.

Second, what might be termed a "public corporation plan," which comprises public districts organized for public purposes, municipal or *quasi* municipal in their nature. Illustrative of this type are Electrical Districts, Irrigation Districts, Reclamation Districts and the usual type of Power District. The underlying purpose of this type of act was stated by the Supreme Court of Oregon in the case of *Noble* v. *Yancey, supra* [116 Or. 356, 241 Pac. 339, 42 A. L. R. 1178], wherein they had under consideration an irrigation district:

"The very purpose of the organization of an irrigation district is that the owners of the land may make a united effort to accomplish the purpose of irrgation.. . . .

"This is the only basis upon which a municipal, or a *quasi* municipal, corporation can be organized. . . . All of the land in a district organized under any irrigation district statute in this state is liable for the just obligations of the district. They are the debts of the district and each statute, when the intent of the Legislature is developed, provides for the liability of all of the land for the payment of the district obligations."

In their briefs in this case both parties concede that the Arizona Power District Act is similar to and most nearly resembles our Irrigation District Act. Code 1939, § 75–201 *et seq.* We believe this to be correct. It is characteristic of this type of district that they do not simply provide for a specific improvement, but provide for a continuing organization formed not merely for the purpose of providing the

means for the payment of certain obligations issued for a specific improvement, but for a continuing district to be operated permanently for the benefit of the lands and inhabitants within the district. Furthermore in none of the acts under the second group is there any provision for apportioning the amount of the benefits among the several tracts of land, or of fixing the amount for which the land is to be assessed, nor any provision that taxes shall be levied in proportion to or limited to the benefits. The debt is rather the district's than that of the parcels of land in the district. The bonds of such districts are general obligations.

The special assessment lien referred to under the first group does not survive the tax sale process any more than does the lien of a private mortgage. The taxing process has in such cases completely cleansed the property of inferior liens and the slate has been wiped clean of the so-called improvement bonds issued thereunder. On the other hand, the bonded obligations incurred by the Districts referred to under the second group survive the tax sale process, and when the realty has been returned to private ownership it is subject to taxation for district bonded and operational purposes, the same as it is for School District or County bonded indebtedness or levies for usual governmental purposes.

One of the legal propositions most heavily relied upon by the plaintiffs is "that a tax deed creates a new title in the nature of an independent grant from the sovereignty, extinguishing all former titles and liens not expressly exempt from its operation," and in support thereof they cite: *McQuity* v. *Doudna,* 101 Iowa 144, 70 N. W. 99; *Hanson* v. *Burris, supra; Clark* v. *Zaleski,* 253 Ill. 63, 97 N. E. 272. As an abstract proposition of law this doubtless is correct. But having reached the conclusion that Power Dis-

trict bonds are general obligations of the District, we hold that viewing the legislation in question, as a whole, the legislature has in effect exempted such liens as those described under the second group from its operation. Hence the above principle is not controlling in this situation.

Considering all of the provisions of the Power District Act, as well as the other pertinent statutes of Arizona, we hold: (1) that Power Districts were organized for public purposes and are *quasi* municipal corporations; (2) that they are given certain sovereign taxing powers, and that the intent of the legislature was to make their district indebtedness general obligations for the payment of which the whole district is obligated; (3) that the sale of real property in such a district for unpaid taxes discharges all tax liens and assessments theretofore levied against the property sold; (4) that the property involved in this litigation was not subject to district assessments after its sale to the State of Arizona, nor was it subject thereto after the issuance of the tax deed to the State and before the sale to plaintiffs; (5) that when the property again passed back into private ownership by sale to plaintiffs it at once became subject to taxation for district purposes. The land remains within the district and is therefore subject to taxes subsequently lawfully levied and assessed for any district purpose, such as: maintenance and operation, bonded indebtedness, and past delinquencies, whether of principal or interest. Since all lands of the district are entitled to equal benefits, it would be arbitrary and unjust to make any distinction between lands theretofore sold for taxes once they went back on to the tax roll, and of other lands in the district that had not passed through this tax sale process.

We are not unmindful that the decision in this case is of far-reaching importance, and will materially affect the faith and credit of the State in future business dealings. We believe that the legislative enactments herein reviewed were calculated and intended to interest and protect investors, without destruction or impairment of the security offered. We belive that the Legislature has made a definite distinction between special assessment obligations and the obligations of *quasi* municipal corporations, such as irrigation and power district bonds.

All the attorneys in the case are deserving of commendation for the fine analytical briefs submitted. These briefs, coupled with the splendid opinion of the trial judge, have materially aided the court and made its task easier.

Since the amended complaint of the plaintiffs failed to state a cause of action against the defendants and no relief could have properly been granted thereunder, the trial court properly dismissed it. Judgment affirmed.

ROSS and STANFORD, JJ., concur.

McALISTER, C. J., being ill, the Honorable LEVI S. UDALL, Judge of the Superior Court of Apache County, was called to sit in his stead.