CONCERNING the APPLICATION FOR WATER RIGHTS OF the TOWN OF ESTES PARK IN LARIMER COUNTY, IN the SOUTH PLATTE RIVER AND ITS TRIBUTARIES, Applicant-Appellant, Cross-Appellee,

v.

NORTHERN COLORADO WATER CONSERVANCY DISTRICT, Objector-Appellee, Cross-Appellant,

and

Thompson Water Users Association, Objector-Appellee,

and

Jim Clark, Division Engineer (No appearance), Appellee.

No. 82SA28.

Supreme Court of Colorado, En Banc.

Feb. 6, 1984.

As Modified Feb. 27, 1984.

---

Chilson & Stanton, John H. Chilson, Loveland, for applicant-appellant, cross-appellee.

Davis, Graham & Stubbs, John M. Sayre, Gregory J. Hobbs, Jr., Denver, for objector-appellee, cross-appellant.

Fischer, Brown, Huddleson & Gunn, Ward H. Fischer, William H. Brown, Fort Collins, for objector-appellee.

LOHR, Justice.

This is an appeal by the Town of Estes Park ("Estes Park," or "town") from the judgment of the water judge for water division 1 denying the town's application for approval of a plan for augmentation. The trial court based its rejection of the plan on the conclusion that the water relied

on by the town for augmentation use is not available for that purpose. Objector[1] Northern Colorado Water Conservancy District ("district") cross-appealed from that portion of the judgment assessing $353.35 against the district as a fee for taking the deposition of W.W. Wheeler, an engineering expert employed by the town. We affirm the dismissal of the application for approval of the augmentation plan and reverse the assessment of the expert witness fee.

## I.

To obtain water for the use of the town and its citizens, Estes Park depends upon three different types of rights: (1) certain relatively junior direct flow water rights with points of diversion on tributaries of the Big Thompson River, which is a tributary of the South Platte River, (2) a contract right with the United States of America to receive 500 acre-feet per year from western slope sources through facilities constructed as part of the Colorado-Big Thompson project, and (3) an allotment of Colorado-Big Thompson project water under agreement with the district. In the past, the town has made out-of-priority diversions from Big Thompson tributaries and has replaced that water with equal quantities obtained under its district allotment. It has utilized its United States contract water by processing it through the town's water treatment plant and distribution system. The unconsumed portion of the United States contract water has been collected by the Estes Park sewage collection system, passed through the town's sewage treatment plant, and returned to the Big Thompson River.

Beginning in 1977, the town conceived of a plan to use its United States contract water for augmentation purposes in a way that would permit increased out-of-priority diversions from Big Thompson tributaries to meet the town's expanding water needs. Early in 1979, Estes Park filed with the water court an application for approval of a plan for augmentation, reflecting the new proposal. *See* section 37–92–302, C.R.S. 1973. Under this plan, Estes Park would use United States contract water to replace the depletions resulting from consumptive use of stream water diverted out of priority. The replacement water would either be released directly into the stream or would be returned to the stream as unconsumed effluent after traveling through the town's water distribution and sewage collection systems.

The district and Thompson Water Users Association filed statements of opposition to the proposed plan. *See* section 37–92–302(1)(b), C.R.S.1973.[2] Among other grounds for opposing the plan, the objectors asserted that Estes Park has no right under its contract with the United States either to use the 500 acre-feet of contract water directly for augmentation purposes or to reuse the water for augmentation or any other purpose after it has been processed through the town's water distribution and sewage collection systems.[3]

The water court elected to resolve first whether the United States contract water was available to Estes Park for replacement purposes as proposed under the plan for augmentation. A trial was held on that limited issue, and the trial court concluded that Estes Park did not have the right to utilize the 500 acre-feet of United States contract water for the proposed augmentation purposes. Accordingly, the court issued judgment denying the application for a plan for augmentation. The water judge

1. In this opinion, the parties who filed statements of opposition to the town's application for approval of a plan for augmentation are sometimes referred to as "objectors."

2. Blue Pond Associates also filed a statement of opposition but later withdrew it.

3. Because the evidence reflects that Estes Park's use of water for municipal purposes is not high-

ly consumptive, the objectors state that by utilizing the 500 acre-feet of United States contract water to replace only the actual depletions caused by municipal use of the water diverted from Big Thompson tributaries, Estes Park would be able to divert approximately 6000 acre-feet of stream water per annum out of priority.

also granted the town's motion that the district reimburse Estes Park for $353.35, to cover the town's expert witness' fee for time spent at his deposition, taken by the district.[4] The town appealed the water court's denial of approval of the plan for augmentation, and the district cross-appealed from the order awarding the expert witness fee to the town. We address those rulings in turn.

## II.

### A.

Whether the water judge correctly denied the application for the plan for augmentation is dependent upon the nature and extent of the rights acquired by Estes Park under its contract with the United States, which is the legal source of the water that the town proposed to use for augmentation purposes. An understanding of the issues requires the presentation of some background information regarding the district and the Colorado-Big Thompson project.

The district was formed in 1937 under the Water Conservancy Act, sections 37–45–101 et seq., C.R.S.1973. The original westerly boundary extended from about twenty miles north of Fort Collins southerly almost to Boulder. Proceeding eastward, the district narrowed as it approached Greeley, forming a fan-like shape. East of Greeley the district encompassed a relatively narrow strip of land along the South Platte River continuing easterly to the Colorado state line. See People ex rel. Rogers v. Letford, 102 Colo. 284, 293–94, 79 P.2d 274, 280 (1938). Initially, Estes Park was not within the district, but in 1967 the district boundaries were expanded to include it. One of the principal reasons the district was formed was to allow Colorado to participate with the United States in development of the Colorado-Big Thompson project ("project"). See id.

On July 5, 1938, the district and the United States of America entered into a contract for the construction of the project ("project contract"). Plans for the project contemplated the diversion of water from the Colorado River system, west of the continental divide, and transportation of that water through a tunnel "from whence, through a series of reservoirs, canals, and other facilities, the water ultimately is destined for delivery to the municipalities and lands in the district." Id. at 294, 79 P.2d at 280. Green Mountain Reservoir, located on the Blue River west of the continental divide, is an integral part of the project, and provides replacement water to compensate western slope interests for the transmountain diversions. Under the project contract, the United States constructed the reservoirs, tunnel, conduits and other facilities necessary to the operation of the project. In return, the district agreed to pay over a forty-year period the costs allocated to the irrigation, domestic and related benefits of the project, exclusive of power benefits.

After the project contract was executed, the United States entered into an agreement with Estes Park dated November 6, 1939 ("town contract"), whereby the United States agreed to furnish the town "a permanent right to use" 500 acre-feet of water annually from the water supply to be made available by the project. The rights acquired by Estes Park under this agreement provide the focal point for the dispute now before us. Estes Park claims that the provisions of the town contract do not limit the town's use or reuse of the water and that the town has the contractual right to use and reuse the 500 acre-feet to extinction. Disputing that claim, the objectors argue that the town contract must be read with the project contract and that when these two documents are considered together the town has neither the right to apply the 500 acre-feet directly for augmentation purposes nor the right to credit for the return flow after that water has passed through

4. The trial court denied Estes Park's application for partial reimbursement for the services of the expert witness as a consultant in devising the plan for augmentation. That ruling was not appealed.

the town's water distribution and sewage collection systems.

The trial court agreed with the objectors. Since the proposed use of the 500 acre-feet was essential to the town's plan for augmentation, the water court's holding that this water was not available for replacement purposes necessitated denial of the plan for augmentation. In order to determine whether the water judge ruled correctly, it is necessary to examine the specific terms of both the town and project contracts, the pertinent facts surrounding the execution and operation of the two contracts, and the relevant principles of contract construction.

### B.

In particular, the objectors rely upon three provisions of the project contract to support their position that Estes Park's United States contract water cannot be used for augmentation. The first is Article 16, which provides in pertinent part:

[T]he District shall have the perpetual right to use all water, excluding water made available by the Green Mountain Reservoir and the water rights reserved in Articles 24 [5] and 25 hereof, that becomes available through the construction and operation of this project, for irrigation, domestic, municipal, and industrial purposes, but excluding any and all uses for power.

The relevant portion of Article 25 provides:

The District agrees that the United States may dispose of to the Town of Estes Park, Colorado, for domestic purposes up to but not to exceed 500 acre-feet of water per annum, the perpetual use of which the District is acquiring under the provisions of this contract.

The other applicable provision of the project contract is Article 19, which states in relevant part:

The District will cause all water filings for the project made in its name or in its behalf to be assigned to the United States, and all water filings so assigned,

or made by the United States for the project, shall be made and held subject to the provisions of Article 16, primarily for domestic, irrigation, municipal, industrial and recreational uses in the District and for such use in the development of hydroelectric energy by the United States as may be made of the waters thus appropriated in their storage, carriage, diversion and distribution to and for such domestic, irrigation, municipal, industrial and recreational uses.

There is also claimed and reserved by the United States for the use of the District for domestic, irrigation and industrial uses, all of the increment, seepage and return flow water which may result from the construction of the project and the importation thereby, from an extraneous source, to-wit, from the Colorado River watershed, of. a new and added supply of water to average 320,000 acre-feet, or more, annually, into the streams of the South Platte watershed from which the irrigable lands within the District derive their water supply; and the right is reserved on behalf of the District to capture, recapture, use and reuse the said added supply so often and as it may appear at the stream intake headgates of ditches and reservoirs serving lands within the District.

. . . . .

It is understood and agreed that the United States does not abandon or relinquish any of the increment or seepage or return flow water coming from the irrigation of lands or other uses supplied with water from or through the works constructed by the United States, 'but that the same is reserved and intended to be retained for the use and benefit of the District.

The trial court concluded that the reservation of return flow for the benefit of the district effected by Article 19 is binding on Estes Park and limits the town's use of the 500 acre-feet made available to it pursuant

---

**5.** Article 24 of the project contract gives the United States the right to release certain project water to the National Park Service for specified uses within Rocky Mountain National Park.

to the rights reserved in Articles 16 and 25 of the project contract.

The town contract, however, makes no specific mention of the project contract or any of its provisions. Pursuant to the town contract,

> "[subject to conditions not relevant here] the United States ... will furnish to the Town ... a permanent right to use annually 500 acre-feet of water at a rate of flow not to exceed 3 cubic feet per second from the water supply which will be made available through and by means of the project works, to be furnished at such times as required by the Town and available in the project works ...."

The water judge noted that certain provisions of the town contract reflect that it was made "in contemplation of" the project contract. First, the explanatory recitals in the town contract refer to the construction of the Colorado-Big Thompson Project and the town's desire to secure the right to use 500 acre-feet of the water supply to be made available through the works of that project. Also, the town contract refers to Power Plant No. 1, which is not defined therein but is described in the project contract. Finally, the town contract provides for payment of $2.00 per acre-foot by the town to the United States "for credit to the Northern Colorado Water Conservancy District on its construction costs of the project, for a period of 40 years ...." The water judge observed that the 40-year period "dovetails with the 40-year repayment period provided in the [project contract]."

The water judge also stated that "[t]he terms of the [project contract] were undoubtedly widely known." The court noted that the project contract contemplates approval by the electors of the district and that while Estes Park was not included in the district at the time of the election, a large part of Larimer County, in which Estes Park is situated, was within the district's original boundaries.

On July 30, 1981, the water judge issued a written decision concluding that the town contract "was supplementary to" the project contract "and was so understood by the parties." Proceeding from that conclusion, the judge determined that the town is bound by the provisions of Article 19 of the project contract reserving return flows to the United States for the benefit of the district, that the return flow water relied upon by Estes Park to supply its plan for augmentation is not available to the town, and that disapproval of the proposed plan for augmentation was required. In further support of its determinations, the trial court found that prior to filing the application for approval of a plan for augmentation "the town made no effort to assert its claim to return flows, while the [district] has consistently asserted its claim to all of the return flows, including those originating from the Estes Park water."

The trial court's July 30, 1981, ruling was confined to use of return flows for augmentation. As the town also proposed to augment by placing United States contract water directly in the stream without passing it through the town's water distribution and sewage collection system, the trial court issued a supplemental memorandum of decision and order on July 31, 1981, addressing the availability of United States contract water for direct application for augmentation purposes. Starting with the earlier conclusion that the town is bound by the terms of the project contract, the water judge noted that Article 25 of that contract, which authorizes the United States to dispose of water to Estes Park under the town contract, provides that the 500 acre-feet are to be furnished to the town "for domestic purposes." Because augmentation use is not a "domestic purpose," the trial court ruled that the 500 acre-feet is not available for direct application for augmentation, and it implicitly reaffirmed its denial of the plan for augmentation.

### C.

█ Significantly, the water in question is foreign to the South Platte River drainage system. It is Colorado River system water that was introduced into the South Platte system as the result of facilities

constructed and developed through the co-operative efforts of the United States and the district under the project contract. Subject to contractual obligations, and possibly other limitations not relevant here, a developer of foreign water has the right to use, reuse, successively use, and dispose of such water. *City and County of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 506 P.2d 144 (1972). *See* Section 37–82–106, C.R.S.1973 (1983 Supp.); *Coryell v. Robinson*, 118 Colo. 225, 194 P.2d 342 (1948); *San Luis Valley Irrigation District v. Prairie Ditch Co.*, 84 Colo. 99, 268 P. 533 (1928); *Comrie v. Sweet*, 75 Colo. 199, 225 P. 214 (1924); *Ripley v. Park Center Land & Water Co.*, 40 Colo. 129, 90 P. 75 (1907).

The project contract prescribes the manner in which Colorado-Big Thompson project water is to be used and reused. Article 16 gives the district the right to use all project water, with three exceptions. The exception pertinent to these proceedings is the right of the United States to dispose of 500 acre-feet of water to Estes Park for domestic purposes under Article 25. Neither Article 16 nor Article 25 makes specific reference to reuse. That subject is covered by Article 19, which reserves to the United States for the use of the district "all of the increment, seepage and return flow water which may result from the construction of the project and the importation thereby, from an extraneous source, to-wit, from the Colorado River watershed, of a new and added supply of water ...." Article 19 goes on to emphasize, "[i]t is understood and agreed that the United States does not abandon or relinquish any of the increment or seepage or return flow water coming from the irrigation of lands or other uses supplied with water from or through the works constructed by the United States, but that the same is reserved and intended to be retained for the use and benefit of the District."

The uncontroverted evidence establishes that return flow rights were critical to the organizational and operational scheme of the district. Because of transportation losses, it is not feasible to utilize the surface stream to deliver project water to that part of the district lying east of Fort Morgan. The value of the project to landowners in the easterly reaches of the district, who bear tax burdens incident to inclusion of their lands in the district, is limited to the return flows from earlier uses. This factual background helps explain the detailed and specific treatment of return flow rights in Article 19 of the project contract.

Contracts should be construed to give effect to the intent of the parties. *Fort Lyon Canal Co. v. Catlin Canal Co.*, 642 P.2d 501 (Colo.1982). In order to determine intent, a contract must be construed as a whole and effect must be given to every provision, if possible. *Gandy v. Park National Bank*, 615 P.2d 20, 22 (Colo.1980). Applying these well-settled principles of contract law, we conclude that it is apparent from the face of the agreement that the parties intended Article 19 of the project contract to reserve return flows for the use of the district. This reservation expressly extends to all return flow water resulting from construction of the project and importation of Colorado River water into the South Platte watershed. The water to be supplied by the United States to Estes Park pursuant to Article 25 of the project contract is imported water resulting from construction of the project and therefore is specifically subject to Article 19's reservation of return flow water for the use of the district. Moreover, the project contract is explicit that the water to be supplied to Estes Park is limited in its use to "domestic purposes."[6] Reading the project contract as a whole, we believe the purpose is clear: the water to be supplied to Estes Park was to be used a single time in its municipal system, and that portion

---

**6.** The town's uses have included domestic, irrigation, street cleaning, fire protection, and light industry. No one contends in this case that these are not all "domestic purposes" within the meaning of the project contract. The evidence reflects that these uses are not highly consumptive.

not consumptively used was to return to the stream for the benefit of the district.

Estes Park contends, however, that it is not bound by the project contract because it was not a party to it. The trial court disagreed, concluding that the town contract, by which Estes Park obtained rights to 500 acre-feet of project water per annum, was made "in contemplation of" the project contract. The record supports this conclusion.

■ When necessary to ascertain the agreement of the parties, separate instruments that pertain to the same transaction should be read together even though they do not expressly refer to each other, and even though they are not executed by the same parties. *St. Paul Fire & Marine Insurance Co. v. Tennefos Construction Co.*, 396 F.2d 623, 629 (8th Cir.1968). In this way each document can provide assistance in determining the meaning intended to be expressed by the others. *Id.* Internal references in one document to another, while not essential, often are helpful in the processes of interpretation. *Id.* The canon of construction requiring that documents be construed together when necessary to ascertain the agreement of the parties has particular force where, as in the case of the project contract (Article 25) and the town contract, the initial document requires execution of the second to accomplish the purpose of the first. *Kurz v. United States*, 156 F.Supp. 99 (S.D.N.Y. 1957).

■ As the trial court noted, there are several indirect references in the town contract to the project contract. It could hardly have been otherwise, because the Colorado-Big Thompson project provides all of the water that is made available to Estes Park under the town contract. Under the foregoing principles of construction, it is appropriate to look to the project contract to assist in determining the nature of the rights intended to be transferred to Estes Park under the town contract. As we have seen, under Article 25 of the project contract, those rights were limited to a single use in the town's municipal system.[7]

■ Furthermore, when the town contract was made, the United States had available for transfer to Estes Park only those rights reserved for such purpose by Article 25 of the project contract. The town's rights are necessarily limited by the terms of the project contract reservation through and on which the town's claim for water is based. *See Merrick v. Ft. Lyon Canal Co.*, 621 P.2d 952 (Colo.1981).

■ It is also well-established that the parties' construction of a contract before a dispute arises is a particularly persuasive aid in determining the true meaning of the agreement. *Nahring v. City & County of Denver*, 174 Colo. 548, 484 P.2d 1235 (1971); *Greeley & Loveland Irrigation Co. v. McCloughan*, 140 Colo. 173, 178, 342 P.2d 1045, 1049 (1959). The town began using contract water in 1955. From that time forward the town has processed contract water through its water distribution and sewage collection systems, using it only once before returning it to the river. Until 1977, when it first conceived the present plan for augmentation, the town never asserted a right to credit for return flow, nor did it seek to utilize the water directly for augmentation purposes or to reuse, successively use, or dispose of the water. During this period the town sought other sources to keep abreast of its increasing water needs. The district, in contrast, has consistently asserted its claim to these return flows. This course of conduct is strongly indicative that the parties to the town contract did not intend that Estes Park have the right to reuse United States

---

7. Even if Estes Park's argument that the town contract must be considered separately were accepted, it does not follow that the United States purported thereby to allow the town the right to reuse the contract water, for the right acquired by Estes Park under that agreement is described simply as "a permanent right to use" contract water. *Cf. Pulaski Irrigating Ditch Co. v. City of Trinidad*, 70 Colo. 565, 203 P. 681 (1922) (right to "use" does not connote right to consume completely).

contract water or to employ it directly for augmentation.

■ For the foregoing reasons, we affirm the water court's determination that the United States contract water is not available to Estes Park for augmentation use, and the court's consequent denial of Estes Park's application for approval of its augmentation plan.

## III.

In its cross-appeal, the district alleges that the water court erred in awarding expert witness fees to Estes Park for the deposition of W.W. Wheeler, the town's water consultant, who was named as a witness by the town. Estes Park moved for and was awarded expert witness fees in the amount of $353.35 pursuant to C.R.C.P. 26(b)(4).

The Colorado Rules of Civil Procedure permit discovery to be obtained from an expert witness to the same extent as from any other witness, unless the "facts known and opinions held" by the expert were "acquired or developed in anticipation of litigation or for trial." C.R.C.P. 26(b)(4). If the facts or opinions sought were developed by the expert in anticipation of litigation or for trial, discovery of those matters can be obtained by an opposing party only upon meeting certain requirements set forth in C.R.C.P. 26(b)(4). In general, C.R.C.P. 26(b)(4)(C) provides for payment of a reasonable fee for an expert's time spent in responding to discovery in circumstances where the subject of discovery is fact or opinion acquired or developed in anticipation of litigation. Where the discovery relates to other matters, however, the rules make no provision for payment of fees to compensate an expert for time required to make discovery.

Colorado's rule is the same as Rule 26(b)(4) of the Federal Rules of Civil Procedure in all material respects. The Advisory Committee for the federal rules has specifically determined that Rule 26(b)(4) is not applicable to the discovery of information held by an expert witness who was an actor in or viewer of the events to which the litigation relates. The Advisory Committee stated:

> It should be noted that the subdivision [26(b)(4)] does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness.

Advisory Committee Notes, 48 F.R.D. 487, 503 (1969).

The district claims that Wheeler was an actor or viewer with respect to events relevant to the town's interpretation of the pertinent contracts and the historical origins of the augmentation plan. Pointing out that the trial was bifurcated for the specific purpose of eliminating the need to take engineering evidence during the first of the two phases of the trial, the district alleges that the only issue open to the court during the initial stage of trial was the appropriate interpretation of the relevant contracts. Evidence regarding prior conduct of the parties and the origins of the augmentation plan was material to that determination. Wheeler was responsible for initiating the plan and then presenting it to the town of Estes Park.

At a hearing on the motion for expert witness fees, counsel for the district advised the water court that discovery of evidence concerning the town's construction of the relevant contracts was crucial to the district's case. The district argued that there were few people better equipped than Wheeler to comment on the history of the town's development of water rights in general and the preparation of this augmentation plan in particular. "That was the purpose of deposing Mr. Wheeler, and there was certainly nobody at the district, or there were few people anywhere who could have given the district the information that Mr. Wheeler possessed." Counsel for the district then went on to state, "[I]t is very clear that as far as engineering issues go, the district got nothing of value [from the

deposition of Mr. Wheeler]. We sought nothing of value on those issues. As a matter of fact, in my introduction to the deposition I told Mr. Wheeler we weren't there to discuss engineering, we would come back and talk to either him or another member of his firm at a later date if that was necessary." A review of Wheeler's deposition confirms that, with incidental exceptions, it was limited to historical matters leading up to the formulation of the plan for augmentation.

Estes Park asserts, however, that the facts obtained and opinions formulated by Wheeler in developing the augmentation plan were acquired in anticipation of litigation since the plan had to be submitted to the courts for approval, was so submitted, and was then made the subject of the present litigation. *See* section 37–92–302(1)(a) and (b), C.R.S.1973 (1983 Supp.). In short, because submission of the augmentation plan for judicial approval was anticipated and resulted in a contested proceeding, the town argues that Wheeler's work preparatory to formulation of the augmentation plan was done in anticipation of this trial.

At the July 30 hearing, the trial judge noted that water court cases generally require engineering testimony and that the roles of engineers as actors and as experts in water matters are inextricably intertwined. The trial court concluded, however, that the time an engineer spends in a deposition is a legitimate cost to the party taking the deposition. Therefore, the judge assessed that cost against the district.

Although this issue has not been decided previously by the Colorado courts, the water court's ruling is contrary to federal decisions interpreting F.R.C.P. 26(b)(4). In *Congrove v. St. Louis-San Francisco Railway Co.*, 77 F.R.D. 503 (W.D.Mo.1978), the district court recognized that Rule 26(b)(4) does not apply where discovery relates to information obtained by an expert as an actor or viewer with respect to the events in question. The court held, "Rule 26(b)(4), however, deals only with '[d]iscovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule *and acquired or developed in anticipation of litigation or for trial....*'" 77 F.R.D. at 504. (Emphasis in original). *Accord Marine Petroleum Co. v. Champlin Petroleum Co.*, 641 F.2d 984 (1979).

There are other cases that recognize this actor-viewer exception to the applicability of Rule 26(b)(4). In *Nelco Corp. v. Slater Electric Inc.*, 80 F.R.D. 411 (E.D.N.Y. 1978), involving a patent infringement action, the defendant attempted to depose a co-inventor who was an applicant for the patent. The plaintiff resisted, arguing that the deponent was an expert who would be called at trial and was therefore protected under Rule 26(b)(4). The court rejected this argument and ordered the deponent to respond to the questions. In so ruling, the court stated:

> [T]hese provisions [26(b)(4)] are *not* applicable to discovery requests directed at information acquired or developed by the deponent as an actor in transactions which concern this lawsuit. Given this conclusion, which is mandated by the legislative intent underlying Rule 26(b)(4)(A), *see* Advisory Committee's Note ... reason dictates that the mere designation by a party of a trial witness as an "expert" does not thereby transmute the experience that the expert witness acquired as an actor into experience that he acquired in anticipation of litigation or for trial.

80 F.R.D. at 414. (Emphasis in original).

Another court held that Rule 26(b)(4) was not applicable to a defendant's request to depose three technicians listed as expert witnesses by a plaintiff in *Duke Gardens Foundation, Inc. v. Universal Restoration, Inc.*, 52 F.R.D. 365 (S.D.N.Y.1971). These technicians worked for a firm that had constructed and maintained greenhouses that the defendant had contracted to repair. Although the plaintiff had retained this same firm for expert advice in anticipation of litigation, the district court held that the defendants could depose the technicians

regarding the design and past repair of the greenhouses and other information acquired prior to the commencement of the lawsuit.

Finally, in the case of *In re Brown Co. Securities Litigation,* 54 F.R.D. 384 (E.D. La.1972), plaintiffs challenging a proxy statement sought to depose experts who were involved in the preparation of the proxy statement and were also retained by the defendant as trial witnesses. The trial court found that the experts were actors in occurrences that were the heart of the subject matter of the suit. The trial court noted that:

> The purpose of Rule 26(b)(4) is to prevent a party from building his case with opinions of experts that his opponent engages for assistance and guidance in the preparation of the merits of litigation. It extends only to those experts whose opinions were 'acquired or developed in anticipation of litigation or for trial.'

54 F.R.D. at 385.

■ The principles enunciated in these cases are applicable to the present litigation. Through its deposition of Wheeler, the district sought to discover facts regarding the town's course of conduct and the origins of the augmentation plan. Wheeler was an actor or viewer with respect to these events, and the information sought on deposition was not prepared in anticipation of litigation or for trial within the meaning of Rule 26(b)(4).[8] To hold otherwise might unduly restrict access to relevant information available only from engineers who participated in the events in controversy. The trial court erred in awarding expert witness fees to Estes Park for the deposition of its water consultant.[9]

We affirm that part of the judgment denying approval of Estes Park's proposed plan for augmentation and reverse the portion of the judgment awarding an expert witness fee to the town.

---

8. Courts have recognized that an expert witness may have acquired some facts and opinions as an actor or viewer and others in anticipation of litigation or for trial. In such circumstances, the former facts and opinions are discoverable without compliance with C.R.C.P. 26(b)(4), whereas the latter are not. *Nelco Corp. v. Slater Electric Inc., supra; Congrove v. St. Louis-San Francisco Railway Co., supra; In re Brown Co. Securities Litigation, supra.*

9. The district argues that, because of the special nature of water cases, including the important public interest in proper allocation of water resources, "[e]ach party should bear the fees involved in having its respective water engineers deposed as part of trial preparation." Because we resolve the matter on a more limited basis, it is unnecessary to address this broader proposition.