EAST RIDGE OF FORT COLLINS, LLC,
a Colorado limited liability company,
Plaintiff–Appellant,

v.

The LARIMER AND WELD IRRIGA-
TION COMPANY, a mutual ditch
company, Defendant–Appellee,

and

Division Engineer for Water Division No.
1, Appellee Pursuant to C.A.R. 1(e).

No. 03SA372.

Supreme Court of Colorado,
En Banc.

March 21, 2005.

Rehearing Denied April 25, 2005.*

* Justice HOBBS would grant the Petition.

Tienkin & Hill, LLP, Alan G. Hill, Louisville, for Plaintiff–Appellant.

The Dow Law Firm, LLC, Mayo Sommermeyer, Fort Collins, for Defendant–Appellee.

KOURLIS, Justice.

This is a water case in which East Ridge of Fort Collins, LLC filed a Complaint for Declaratory Judgment against the Larimer and Weld Irrigation Company ("Irrigation Company"), a mutual ditch company. In the Complaint, East Ridge averred that it was the owner of certain real estate and, as such, successor in interest to the rights and privileges conferred by two contracts: one entered into between Benjamin H. Eaton and Clara A. McGinley and another entered into between Eaton and Zur C. Plummer, dated April 1878 (collectively referred to as "the Contracts"). East Ridge sought a declaration from the court that its interest in water delivered to the real property pursuant to the two Contracts was not perpetually restricted to irrigation of the property, but rather was a water right capable of being

changed in point of diversion and place and type of use. The Irrigation Company countered that the Contracts did provide for the delivery of water, but did not establish water rights in East Ridge that could be changed.

The matter proceeded to trial before the Water Court in September of 2003, and the court entered its Order on October 30, 2003, declaring that the nature and extent of East Ridge's right to water under the Contracts was limited to the terms of the contract—namely, the right to divert water from the Larimer and Weld Ditch at a specified location to irrigate the eighty acres of land identified in the Contracts—and did not include the right to change the delivery of the water absent the consent of the Irrigation Company.

East Ridge appealed to this court, stating six issues for our review.[1] We now conclude that East Ridge does not own water rights in any traditional sense; rather, East Ridge owns contractual water delivery rights. Thus, we must look to the contracts themselves to answer any questions concerning the nature of those delivery rights. The contracts are ambiguous. Thus, we look to extrinsic evidence. That extrinsic evidence reflects various facts: (1) the water rights originally held by East Ridge's predecessors were made a part of the Irrigation Company's decree in consideration of the Contracts; (2) East Ridge's predecessors did not receive shares in the Irrigation Company; (3) the minutes of the Irrigation Company's shareholder meeting reflect an intent to restrict the contractual delivery rights to the land owned by the grantors; and (4) a weighing of the benefits of the bargain supports the con-

clusion that the preferred rights were tied to the property and use specified. Thus, when we look at all surrounding circumstances, we determine that the Contracts created restrictive rights to receive a certain amount of water for the purpose of irrigating identified lands. The restrictive delivery rights cannot, therefore, support a change of use and change of place of diversion proceeding. Accordingly, we affirm the Water Court.

## I. FACTS

In approximately 1864, several individuals dug a ditch from the Cache la Poudre River to their lands, for the purpose of diverting irrigation water. This ditch was called the No. 10 Ditch, and the Irrigating Ditch Company No. 10 was incorporated in 1873. The Certificate of Incorporation states that "the use for which the said water is intended is for irrigation and no other." Eventually, the No. 10 irrigated 17 properties.

In the 1870s, Benjamin H. Eaton conceived the plan of building a large irrigation system. He wished to acquire the diversion structures and ditch of the No. 10. Eaton made a proposal to each of the shareholders and, in 1878, acquired the interests of every shareholder. By deed of March 12, 1879, the Irrigating Ditch Company No. 10 itself conveyed all of its rights, title and interest in itself, including "all appurtenances of said ditch, together with all privileges, franchises and rights acquired by reason of its incorporation and association" to Eaton. The contracts with the individual shareholders include the two contracts at issue in this case.

---

1. Petitioner presented six issues for review:
 1) Whether the water court erred in determining that the two 1878 contracts were unambiguous.
 2) Whether the water court erred in failing to consider evidence outside the four corners of the two 1878 contracts, which would lead to a finding that the right to use water held by East Ridge can be changed pursuant to applicable statute.
 3) Whether the water court erred in failing to properly consider the conduct of the parties, including the parties' characterization of the right to use this water, the quantification of the water, and other conduct, in interpreting these contracts.

 4) Whether the water court erred in failing to properly consider the characterization of this water in various supreme court, court of appeals, and trial court cases that were previously litigated.
 5) Whether the water court erred by failing to properly consider the effect of the forfeiture clause in the two 1878 contracts.
 6) Even if the two 1878 contracts are unambiguous, whether the water court erred in determining that these contracts limited the use of the water described therein to irrigation of certain lands forever.

Pursuant to those contracts, the shareholders in the old No. 10 transferred all of their right, title and interest in the irrigation ditch to Benjamin H. Eaton. Each of the contracts provided as follows: that the owner

> shall have the right and privilege and the said right and privilege is hereby granted unto the said [owner] to take from said Irrigating Ditch No. 10 at the place where the lower portion of said ditch as now constructed intersects with a new survey made by said Benjamin H. Eaton, a sufficient quantity of water to irrigate eighty acres of land and no more. The right to irrigate the said eighty acres of land from said ditch shall be perpetual and without expense to the said [owner] in maintaining said ditch.

The contract language provided, in addition, that each grantor was conveying "all the right, title and interest which I have in and to any share, shares, parts of shares or privilege or any surplus credit for and on account of any work and labor performed on account of the same in the irrigating ditch known as Irrigating Ditch Company Number ten (10)." The remedy clause provided that:

> It is further agreed by the said Benjamin H. Eaton that in case he should fail to keep said ditch in repair so that there should not be a sufficient supply of water in said ditch to irrigate said eighty acres of land then the said Benjamin H. Eaton shall forfeit his right by virtue of such sale above made after due notice of such failure and neglect on his part (and further failure and neglect after said notice) to perform his agreement as aforesaid.

Easements for the ditch were the subject of separate deeds.

Eaton and the Larimer and Weld Irrigation Company then sought adjudication of the water rights on the Cache La Poudre River. The Water Court, in its Decree dated April 11, 1882, awarded 3 cfs with an appropriation date of June 1, 1864, to the Irrigation Company, and awarded an additional 718.47 cfs with varying later appropriation dates. All of the water decreed was to be diverted through a diversion structure located at the original headgate of the No. 10 Ditch, and carried in the original No. 10 Ditch and, in addition, all of the rights were adjudicated either to Eaton individually (which he later conveyed to the Irrigation Company) or to the Irrigation Company.

The relationship between the original owners of the No. 10 Ditch and the Irrigation Company has not been without its bumps in the 125 years since that time. For example, the parties became involved in litigation in 1893 before this court on the question of estimated capacity of the company's canal to furnish water. *See Wyatt v. Larimer & Weld Irr. Co.,* 18 Colo. 298, 33 P. 144 (1893). From *Wyatt,* we gain some historical perspective. Specifically, the court noted that "in 1879, upon the acquisition of canal No. 10, the company entered into contracts with the persons who had acquired vested appropriations by virtue of user of [sic] water therefrom, expressly recognizing and confirming their rights to the continued use of water from defendant's canal, in the aggregate of 29¾ 80-acre water rights, and allowing the owners of such rights to divert the full quota of water appertaining thereof, and without pro-rating with other owners of water rights in the canal in times of scarcity." *Id.* at 298, 33 P. at 146. The second time that case came to this court, in 1897, the court again referred to the No. 10 water as the "29 3/4 preferred water rights." *Larimer & Weld Irr. Co. v. Wyatt,* 23 Colo. 480, 48 P. 528, 528-9 (1897).

A report admitted into evidence in this case, prepared in 1935 by the attorney for the Irrigation Company indicates that all other users of water had their contracts converted into shares of stock within the Larimer and Weld Irrigation Company, based upon a 1 share per 80 acres owned formula, and also equaling an entitlement to 1.44 cfs for each 80 acres or share owned. The No. 10 Ditch owners' interests did not undergo that conversion, such that those owners held no interest in the Irrigation Company itself. Rather, the No. 10 rights were continually referred to as "preferred" rights to be satisfied before the shareholder interests.

Hence, the question before the court at this time is the nature of the No. 10 rights: are they water rights capable of being conveyed, changed and moved? Or, are they

contractual rights governed by their terms, which—if unused for the purposes specified—are forfeited to the Irrigation Company?

## II. ANALYSIS

To answer that question, we first address the nature of mutual ditch companies and the water rights held in those entities, then we turn to basic contract principles and their applicability to water cases, and lastly to the interface between those two legal principles for purposes of this case.

### A. Mutual Ditch Companies

■ A mutual ditch company is not organized for profit, but exists primarily for the benefit of the shareholders. *Nelson v. Lake Canal Co. of Colo.*, 644 P.2d 55 (Colo. App.1981). They are recognized in Colorado as quasi-public carriers. Colo. Const. art. 10, § 3; § 7–42–102 *et. seq.*, C.R.S. (2004). Mutual ditch companies operate on the premise that the company owns the water rights and other property, including ditch easements, and the shareholders have the right to use the water on their lands. *Fort Lyon Canal Co. v. Catlin Canal Co.*, 642 P.2d 501 (Colo. 1982); *Jacobucci v. District Court*, 189 Colo. 380, 541 P.2d 667 (1975). Shares of stock in a mutual ditch company represent a definite and specific water right, as well as a corresponding interest in the structures by which the water right is beneficially used. *Jacobucci*, 189 Colo. at 387, 541 P.2d at 672.

### B. A Shareholder's Right to Change Place of Use

■ In Colorado, a water right generally is not appurtenant to certain lands. *Bloom v. West*, 3 Colo.App. 212, 219, 32 P. 846, 848 (1893). Thus, water rights can be bought, sold and transferred separate from the land. *See Strickler v. Colorado Springs*, 16 Colo. 61, 70, 26 P. 313, 316 (1891); *see also Lower Latham Ditch Co. v. Bijou Irrigation Co.*, 41 Colo. 212, 216, 93 P. 483, 484 (1907). Water rights are governed by Colorado's Water Right Determination and Administration Act of 1969. § 37–92–101 *et seq.*, C.R.S. (2004). Under the Act, a change of water right "shall be approved if such change will not injurious-

ly affect" other water rights. § 37–92–305(3), C.R.S. (2004).

■ Generally, the owner of shares of stock in a mutual ditch company has the same right to seek a change of water right as any other appropriator. However, this right is not statutory. *Merrick v. Fort Lyon Canal Co.*, 621 P.2d 952 (Colo.1981).

### C. Contract Rights

East Ridge does not hold any shares in the Irrigation Company. East Ridge is also not the decreed owner of a water right that has been adjudicated in water court. To the contrary, the water that East Ridge has been using is, in fact, decreed to the Irrigation Company, and East Ridge's predecessor's dates of appropriation were used in obtaining that decree.

■ Where the water consumer is neither an appropriator nor a shareholder, he may nonetheless have contractual rights to make use of water. *See Green v. Chaffee Ditch Co.*, 150 Colo. 91, 98, 371 P.2d 775, 779 (1962). However, the instrument granting rights of use becomes the dispositive instrument rather than the statutes.

Accordingly, East Ridge has a contractual delivery right governed by the deed and not by section 37–92–305(3). Therefore, the question to be resolved is whether East Ridge's rights are tied to certain described uses and lands by contract, or whether they may be removed from those lands.

### i. Contract Interpretation

As with any contract, we must examine its terms and attempt to determine the intent of the parties. Here, we undertake that very inquiry with respect to East Ridge's entitlement to seek a change of water right.

East Ridge claims water rights pursuant to two distinct contracts executed in 1878. The Plummer contract grants Plummer the right and privilege "to take from said irrigation ditch number ten ... a sufficient quantity of water to irrigate eighty acres of land and no more." The McGinley contract states that McGinley may take a sufficient quantity of water to irrigate a specifically described

eighty acres.[2] The Plummer and McGinley contracts clarify the right granted as a right to irrigate "said eighty acres" and "said land," respectively.

We must determine whether the terms of the two contracts are descriptive or restrictive in nature—namely, whether the reference to irrigation of the grantor's 80 acres is merely a descriptive term in the contract, or whether it is a restrictive term that limits the use accordingly. The tension between those two alternatives, and the possibility that the language could be read either way, leads us to conclude, as did the trial court, that the contracts are inherently ambiguous on this point.

 Whether a written contract is ambiguous is a question of law that we review *de novo*. *Lake Durango Water Co., Inc. v. Pub. Util. Co.*, 67 P.3d 12, 20 (Colo.2003). Mere disagreement of the parties does not necessarily indicate the documents are ambiguous. *USI Properties East, Inc. v. Simpson*, 938 P.2d 168 (Colo.1997). Rather, a contract is ambiguous "if it is fairly susceptible to more than one interpretation." *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo.1996).

 Water contracts are interpreted according to general contract principles. *See Golden v. Simpson*, 83 P.3d 87, 93 (Colo. 2004) (stipulated change decree interpreted under contract principles); *USI Properties East*, 938 P.2d 168. It is axiomatic that a contract must be construed to ascertain and effectuate the intent of the parties as determined primarily from the language of the contract. *May v. United States*, 756 P.2d 362, 369 (Colo.1988). To this end, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used. *Lake Durango Water Co.*, 67 P.3d at 20. However, our courts no longer apply a rigid "four corners" rule. *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1236 (Colo.1998). Thus, extrinsic evidence may be conditionally admitted to determine whether the contract is ambiguous. *Id.* at 1235. The fact that extrinsic evidence may reveal ambiguities in the contract is especially true when construing an ancient document. *Lobato v. Taylor*, 71 P.3d 938, 947 (Colo.2002).

### ii. Extrinsic Evidence

 When an ambiguity has been determined to exist, the meaning of its terms is generally an issue of fact to be determined in the same manner as other factual issues. *Union Rural Electric Ass'n, Inc. v. Pub. Util. Com'n*, 661 P.2d 247, 251 n. 5 (Colo. 1983); *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo.1984). Courts must then give effect to the intention of the parties by considering "competent evidence bearing upon the construction given to the instrument by the parties themselves, by their acts and conduct in its performance." *McPhee v. Young*, 13 Colo. 80, 21 P. 1014, 1016 (1889). Thus, when a court determines that a document is ambiguous, it may then consider parol evidence to explain or clarify the meaning of a document or the effect of its provisions. *In re Applications for Water Rights of the Upper Gunnison River Water Conservancy District*, 838 P.2d 840, 850 (Colo.1992); *McNichols v. City & County of Denver*, 120 Colo. 380, 209 P.2d 910 (1949).

 The language of the contract itself controls the determination of whether certain extrinsic evidence is relevant. *Lazy Dog*, 965 P.2d at 1236. The court may consider circumstances surrounding the transaction, *Daum v. Conley*, 27 Colo. 56, 64, 59 P. 753, 756 (1899), including previous decrees and proceedings and oral testimony addressing related circumstances, *Farmers High Line Canal v. Golden*, 975 P.2d 189, 193 (Colo.1999). *See also Frantz v. Bartels*, 63 Colo. 246, 250, 165 P. 769, 770 (1917). Colorado has long recognized the rule that in construing a contract, the courts will follow the construction placed upon it by the parties themselves. *Greeley & Loveland Irr. Co. v. McCloughan*, 140 Colo. 173, 342 P.2d 1045

---

**2.** Under contract, McGinley was granted the right to take "a sufficient quantity of water to irrigate the following described land in Larimer County, State of Colorado, to wit: The north half of the north east quarter of section eight (8) Township seven (7) North, Range Sixty–Eight (68) West, Eighty acres."

(1959). Thus, we have found the conduct of the parties before the controversy arose to be a reliable test of their interpretation of the agreement. *Town of Estes Park v. N. Colo. Water Conservancy District,* 677 P.2d 320, 327 (Colo.1984).

■ Furthermore, separate instruments that pertain to the same transaction should be read together even though they do not expressly refer to each other, and even though they are not executed by the same parties. *Id.* (where town submitted plan for augmentation, court considered town and project contract to construe town's water rights). This canon of construction has particular force where the initial document requires execution of the second to accomplish the purpose of the first, *id.,* or in this case, where East Ridge's rights are dependent upon the interpretation of a series of transactions between Eaton and various individuals and entities.

## III. Application of the Law to these Facts

■ We turn to an examination of the contractual provisions which are the source of the dispute in this case. First, the Contracts provide:

> The right and privilege ... to take from said irrigating ditch number ten ... a sufficient quantity of water to irrigate eighty acres of land and no more.[3]

Here, we conclude that the Contracts are ambiguous on their face with respect to whether the water delivery rights may be

changed and moved. To determine whether the parties intended the contract language to be descriptive or restrictive, we must look to extrinsic evidence.

First, we note that the water rights originally held by the No. 10 Ditch Owners were a part of decrees adjudicated to the Irrigation Company. Thus, there is a clear inference that the water rights themselves were transferred to the Irrigation Company under the terms of the Contracts, and that, in return, the Irrigation Company granted a delivery right. That delivery right was tied to certain lands owned by East Ridge's predecessors.[4]

As a matter of law, other courts have found that reference to irrigation of certain lands is restrictive in nature. *See In the Matter of the Application for water rights of the City of Northglenn in the South Platte River and Its Tributaries in Jefferson, Adams and Weld Counties,* Case No. 79CW236 (Dist. Ct. Water Div. I) (Sept. 25, 1981) (deed contained provision which identified quarter/section of land irrigation would serve); *Wright v. Platte Val. Irr. Co.,* 27 Colo. 322, 61 P. 603 (1900) (court held provision of contract limiting application of irrigation water to described lands valid and enforceable).

The Minutes of the Irrigation Company's Shareholders' meeting on March 25, 1878, reflect that Eaton had "made a proposition to enlarge our ditch and give each share holder all the water that they might want *for the land that they were now depending on Ditch No. 10 for*" (emphasis added). This state-

---

3. The provision quoted above is taken from the Z.C. Plummer contract. While that contract did not identify the land constituting the 80 acres other than as the land owned by Plummer, the second contract East Ridge claims title under, the McGinley contract, identified a specific half-quarter section that constituted eighty acres.

4. Other contracts executed by Eaton to acquire other water usage rights contain different, more restrictive, terms that clarify that the water may not be removed from the real property. The Irrigation Company argues that those other contracts demonstrate that Eaton intended to restrict the use of irrigation water to a designated acreage in all contracts. East Ridge argues that because other contracts explicitly restricted the rights and this contract did not, the presumption must be that Eaton did not intend to restrict the

use of this water. First, in the 1883 Temple Contract, Temple received 8 shares of stock in the Irrigation Company. The contract provides "said water shall be used only for domestic purposes, and to irrigate the following described tract of lands, and none other, to wit: all of Section Nine (9) in Township Seven (7) North of Range Sixty–Eight (68) West of the 6th Principal Meridian." The second contract, executed in 1901 between the Irrigation Company and Brandis gave Brandis "a right to the use of water from the canal ... in the amount necessary to irrigate eighty acres of land as above stated, and upon no other land ..." Both because the other contracts could be read to support either position, and because they were significantly later in time, we do not find them persuasive.

ment also supports a conclusion that the reference to the real property was a restrictive, and not a descriptive, term.

Lastly, we must construe the agreement in a manner that allows each party to receive the benefit of the bargain and reflects the reasonable expectations of the parties within the scope of the agreement. *Allen v. Pacheco,* 71 P.3d 375, 378 (Colo.2003). Thus, we attach importance to the fact that these delivery rights were priority rights, to be satisfied before the mutual ditch company's shareholder's rights. Presumably, over the years, there were times when the priority right holders received water and the owners of shares in the ditch company did not because there was not enough water to satisfy both. That fact supports the notion that the contract language was restrictive rather than descriptive, because it is illogical to assume that the shareholders would have agreed to subordination AND to the risk that the water would someday be removed entirely from the system. This presumption is consistent with our practice of considering the purpose and impact of the agreement on the parties as a means of determining their intent. *See, e.g., Lobato,* 71 P.3d at 947 (evidence showed contract memorialized commitment made to induce families to settle in wilderness; supports presumption that easement was intended to create permanent rights running with the land); *Hastings & Heyden Realty Co. v. Gest,* 70 Colo. 278, 283, 201 P. 37, 39 (1921) (comparison of property value without water rights and the purchase price paid led to presumption that intent of the parties was to transfer water rights with the land); *Gelwicks v. Todd,* 24 Colo. 494, 498, 52 P. 788, 790 (1898) (same); *McPhee,* 13 Colo. at 87, 21 P. at 1016 (holding it is essential to discover mutual promises of the parties and the consideration from each to the other to discern intent of parties).

 The McGinley contract clearly described an eighty acre portion of land. We cannot dismiss this language as merely descriptive of the character of McGinley's water right. A contract is restrictive in character if the terms serve to narrow and limit the scope of the agreement. *See Flanary v. Kane,* 102 Va. 547, 46 S.E. 312, 316 (1904).

To consider such words as merely descriptive in nature would violate our well settled rule of construction that every part of a writing must be given effect. The Plummer contract, although it did not describe a particular parcel of land, still falls prey to the conclusion that its terms were restrictive, given the extrinsic evidence.

## IV. Conclusion

We conclude that East Ridge's rights must be determined by the terms of the water contracts through and on which the claims for water are based. East Ridge has a right to use water as provided in the water contracts, and these rights are governed by the contract and not by section 37–92–305(3).

The language of the Contracts is ambiguous, but an examination of extrinsic evidence leads us to believe that the parties intended to restrict the delivery of water to irrigation on property owned by Plummer and McGinley at the time.

Accordingly, we affirm the Water Court's decision that the rights may not be changed from the location or use to which the contract assigns them.

Justice HOBBS, dissenting.

I respectfully dissent. In my view, the water court erred by depriving East Ridge of the benefit of the bargain for which its predecessors in interest contracted under the 1878 and 1879 contracts. Those predecessors had valuable water rights and rights-of-way for the No. 10 Ditch, which they conveyed to Benjamin Eaton for construction and operation of the Larimer and Weld Canal in return for a perpetual water guarantee.

The 3 cfs No. 10 Ditch water right carried an appropriation date of June 1, 1864, a very early date for the Poudre River and the South Platte Basin as a whole. Benjamin Eaton, designer of the much longer Larimer and Weld Canal, wanted to align his new ditch on the right-of-way of the No. 10 Ditch. He also wanted the advantage of the No. 10 Ditch's early priority, knowing that the other water rights for the Larimer and Weld Canal would carry a later date. In fact, the court

adjudication decree of 1882 makes the remainder of Larimer Weld's 721.47 cfs right junior to the 3 cfs right.

The agreements at issue here are absolutely clear that the owners of the No. 10 water rights and right-of-way were bargaining for a perpetual first draw on the water diverted by the Larimer and Weld Canal. All the shareholders of The Larimer and Weld Irrigation Company were to stand perpetually in the second position. The Majority, as did the water court, recognizes that this was the intent of the parties, but restricts the rights of the original owners of the No. 10 water right only to irrigation of particular plots of land in perpetuity.

Yet, the water court and the Majority assume that everyone else holding a water interest in the ditch by reason of share ownership in the Larimer and Weld Irrigation Company may change the use of their irrigation water to other uses and may remove the water from the parcels they historically irrigated. Only the beneficiaries of the first and best priority in the ditch are restricted to irrigation on particular parcels, on pain of forfeiting their right to water delivery from the ditch altogether.

This result is shocking, unconscionable, and contrary to Colorado law, in my view. While all others on the ditch are free to realize modern-day market value of their water, the owners of first priority are made to be last in realizing that value.

I agree with the Majority that the contracts between the No. 10 Ditch owners and Eaton are ambiguous. Accordingly, extrinsic evidence surrounding the formation of the agreements is admissible to arrive at a construction that carries out the intent of the parties.

The Majority relies primarily on expressions in the agreement and irrigation company minutes that the water was to be delivered only for irrigation on particular parcels. In my view, however, neither the water court nor the Majority take into account the most important extrinsic evidence bearing on the parties' intent.

When the agreement was made between the No. 10 Ditch owners and Benjamin Eaton, no one in Colorado was obtaining priorities for any use of water other than irrigation. In fact, the Act of 1879 (Act of Feb. 19, 1879, sec. 18, 1879 Colo. Sess. Laws 94, 99) and the Act of 1881 (Act of Feb. 23, 1881, sec. 22, 1881 Colo. Sess. Laws 142, 154–55) were restricted to the adjudication of irrigation priorities.

This changed as a result of cities' growing demand for water as the Nineteenth Century ran its course. Not until 1891, in *Strickler v. City of Colorado Springs,* 16 Colo. 61, 26 P. 313, 315 (1891), did we recognize that cities could obtain irrigation rights and change them to municipal use. Following our decision, the 1899 act authorized a change of irrigation rights to other uses (Act of Apr. 6, 1899, ch. 105, sec. 1, 1899 Colo. Sess. Laws 235, 235–36). In 1903, the General Assembly authorized adjudication of priorities for all other types of uses in addition to irrigation. (Act of Apr. 11, 1903, ch. 130, sec. 1, 1903 Colo. Sess. Laws 297, 297).

Inexorably, irrigation in the South Platte Basin and population growth was giving rise to municipal and industrial use. Colorado's changing economy necessitated a market mechanism for transferring water from irrigation to other uses, despite the assumption of the original founders of the ditches that only irrigation use for lands under the ditches would be made perpetually. Because the valuable senior priorities in the South Platte, and elsewhere in the state, were obtained only for irrigation of land under ditches-as the adjudications so specified-Colorado had to find a way to allow a market for this altered expectation.

In the Twenty–First Century, water courts are routinely engaged in changing irrigation water use to other uses on a willing buyer/willing seller basis, unless the ditch company has a by-law restricting water from being taken out of the ditch. Apparently, the Larimer and Weld Irrigation Company has no such by-law for anyone else but the successors in interest to the No. 10 Ditch water right owners.

I fully recognize that our case law typically characterizes a water delivery contract as being less than a full water right. But the

facts in this case are unique, and the contract should be given its full effect. The No. 10 Ditch water right owners had fully vested water rights and traded them for the preferred right in the new Larimer and Weld Canal. So long as only irrigation use can be made as to all parcels under the Larimer and Weld Canal, the benefit of the bargain mutually arrived at in the 1870s is mutually honored. But, if those who are successors in interest to the second users of Larimer and Weld Canal water are allowed to change their water use, then the successors in interest to the preferred users should be accorded the same privilege. Only such a construction will honor the intent of the parties.

If some water users on this ditch are accorded an opportunity to quantify the amount of water historically used on their irrigated parcels and change the delivery of that water to other uses, then all should be accorded such opportunity. The water court is well-equipped to impose the necessary conditions to accomplish this outcome without injury to other water rights.

Accordingly, I respectfully dissent.